PEOPLE v COLLINS

Docket No. 86690. Argued October 4, 1990 (Calendar No. 13). Decided
August 22, 1991.

W. C. Collins was charged in the Berrien Circuit Court with
obstruction of justice. The court, Ronald J. Taylor, J., granted
the defendant's motion to suppress recorded evidence of conver-
sations between him and a police informant, electronically
monitored by the police with the informant's consent, on the
authority of *People v Beavers,* 393 Mich 554 (1975), which ruled
that electronic monitoring by police of conversations without
warrants, even though consented to by one of the conversants,
violates Const 1963, art 1, § 11, requiring the exclusion of such
evidence. Because the affidavit provided to support the warrant
did not conform to statutory requirements, the evidence was
suppressed. The Court of Appeals, MAHER, P.J., and D. E.
HOLBROOK, JR., and R. E. NOBLE, JJ., affirmed in an unpub-
lished opinion per curiam (Docket No. 103047). The people
appeal.

In an opinion by Justice GRIFFIN, joined by Justices BRICKLEY,
BOYLE and RILEY, the Supreme Court *held:*

The participant monitoring of the defendant without a war-
rant violated no reasonable expectation of privacy on the part
of the defendant. Thus, because the Supreme Court of the
United States has held that participant monitoring of conversa-
tions does not offend the Fourth Amendment, and because no
compelling reason exists to impose a different, more restrictive
construction upon Const 1963, art 1, § 11, the decision of *People
v Beavers* is overruled.

1. Fourth Amendment interests are implicated when the
government infringes upon a person's justifiable or legitimate
expectation of privacy. While recognizing the Fourth Amend-
ment's application to nonconsensual electronic surveillance, the
United States Supreme Court has imposed no restrictions on
participant monitoring because a defendant has no justifiable

REFERENCES
Am Jur 2d, Searches and Seizures §§ 24, 46.
See the Index to Annotations under Eavesdropping and Wiretap-
ping.

and constitutionally protected expectation that a person with whom a conversation is had will not reveal the conversation to the police, or that the conversations will not be monitored or recorded. In addition, Congress, in enacting 18 USC 2510, title III, expressly exempted participant monitoring from the warrant requirement for nonconsensual electronic surveillance.

2. *People v Beavers,* in holding that Const 1963, art 1, § 11 requires a warrant for participant monitoring, relied exclusively on federal case law. It made no reference to the history of art 1, § 11 and placed no reliance on textual differences with respect to the Michigan and United States Constitutions. The United States Constitution does not protect the privacy of persons whose conversations are monitored, nor does the Fourth Amendment require a warrant in the case of participant monitoring. Absent a compelling reason to impose a different interpretation, art 1, § 11 provides the same protection as that secured by the Fourth Amendment. The framers of art 1, § 11 did not intend to expand the protection of the search and seizure provision beyond that secured by the Fourth Amendment. The history of art 1, § 11 and its plain import suggest that its further expansion, with the concomitant expansion of the exclusionary rule to enforce it, should occur only when there is a compelling reason to do so.

3. Participant monitoring represents a vitally important investigative tool crucial in establishing the credibility of an informant. Courts should not be too ready to erect constitutional barriers to relevant and probative evidence which is also accurate and reliable. In this case the participant monitoring without a warrant did not violate any reasonable expectation of privacy on the part of the defendant.

Reversed.

Chief Justice CAVANAGH, joined by Justice LEVIN, dissenting, stated that absent a fundamental change in the law or a difference in the facts of the case, established precedent should prevail. The advance of technology makes it imperative that we be more diligent, not less, in protecting the right of people against unreasonable searches and seizures. *People v Beavers,* 393 Mich 554 (1975), recognized that surveillance is a vital component of law enforcement, but that privacy concerns justify the minimal inconvenience of getting a warrant to perform this surveillance. Preserving the warrant requirement is not an expansion, but rather the preservation of the status quo. Without a warrant requirement there is no limit to police officer discretion, and free and open discourse is no longer a reasonable risk; instead, the risk becomes an inordinate one in which

even the person to whom you are speaking forfeits the option of keeping the discourse private. With third-party monitoring, the option is bargained away in advance before the content of the conversation is even ascertained. There have been no changing conditions or evidence of injustice which would justify retreating from the established precedent in *Beavers.* Adherence to sound judicial precedent gives continuity and predictability to the law. It assures that judicial decisions will be the result of reason rather than the whim of the judge. Only compelling reasons justify a court in disregarding longstanding precedent.

Justice MALLETT took no part in the decision of this case.

393 Mich 554; 227 NW2d 511 (1975) overruled.

1. SEARCHES AND SEIZURES — WITHOUT WARRANTS — PARTICIPANT MONITORING — SUPPRESSION OF EVIDENCE.

Electronic monitoring by the police without a warrant of a conversation consented to by one of the conversants does not violate Const 1963, art 1, § 11 and does not require suppression of the evidence.

2. SEARCHES AND SEIZURES — WITHOUT WARRANTS — PARTICIPANT MONITORING.

In the case of participant monitoring of conversations without warrants, Const 1963, art 1, § 11 affords no greater protection than that provided by the Fourth Amendment (US Const, Am IV, Const 1963, art 1, § 11).

*Frank J. Kelley,* Attorney General, *Gay Secor Hardy,* Solicitor General, *Timothy A. Baughman,* Chief, Research, Training and Appeals, *Dennis M. Wiley,* Prosecuting Attorney, *David P. LaForge* and *Daniel M. Levy,* Assistant Prosecuting Attorneys, and *James E. Boardman,* Legal Research Assistant, for the people.

State Appellate Defender (by *Derrick A. Carter)* for the defendant.

Amicus Curiae:

*John D. O'Hair,* President, and *Timothy A. Baughman,* Chief, Research, Training and Appeals, for the Prosecuting Attorneys Association of Michigan.

GRIFFIN, J. We are required to decide whether recorded evidence of conversations between this defendant and a police informant, electronically monitored by police with the informant's consent, but without a valid search warrant, must be suppressed in defendant's subsequent felony trial. In *People v Beavers,* 393 Mich 554; 227 NW2d 511 (1975), this Court ruled that the warrantless electronic monitoring by the police of a conversation, even though consented to by one of the conversants, violates art 1, § 11 of the Michigan Constitution, requiring the exclusion at trial of evidence thus obtained. Our examination of developments in the search and seizure jurisprudence since *Beavers* and our review of the history of the adoption of Const 1963, art 1, § 11 prompt us to reconsider the *Beavers* decision. Finding it now well settled that such participant monitoring[1] does not offend the Fourth Amendment of the United States Constitution,[2] and because we are not persuaded that compelling reason exists to impose a different, more restrictive construction upon the parallel provision of our Michigan Constitution, we overrule *Beavers,* and reverse the decision of the Court of Appeals.

I

After a preliminary examination, defendant W. C. Collins was bound over on a charge of obstruction of justice. MCL 750.505; MSA 28.773. The charge arose out of the following facts.

Earl Jordan, an acquaintance of defendant, ap-

---

[1] We use the term "participant monitoring" to refer only to the electronic monitoring (whether or not recorded) by a law enforcement agent of a conversation where one of the parties to the conversation has previously consented to the activity.

[2] *United States v Caceres,* 440 US 741; 99 S Ct 1465; 59 L Ed 2d 733 (1979); *United States v White,* 401 US 745; 91 S Ct 1122; 28 L Ed 2d 453 (1971).

proached a state police officer and reported that
defendant had offered him $500 to present false
testimony to a local district court judge presiding
over an unrelated criminal proceeding involving
defendant's wife.[3] Upon the basis of the informa-
tion furnished by Jordan, a state police officer
obtained a warrant purporting to authorize the
participant monitoring and recording of conversa-
tions between Jordan and defendant.[4] Thereafter,
Jordan placed a telephone call to defendant from
the state police office, and the conversation, which
included incriminating statements by defendant,
was monitored and recorded by the police with
Jordan's consent.[5] Jordan also agreed to wear a
concealed radio transmitter later that day when
he was to meet and talk with defendant in the
latter's automobile. During the course of this con-
versation, defendant made more incriminating
statements which were electronically overheard
and recorded by the police.[6]

---

[3] According to testimony given by Jordan at defendant's prelimi-
nary examination, defendant's wife had been convicted of filing a
false police report after she reported that an assailant had fired a
shot at her at a local school. Defendant asked Jordan to tell the judge
that he (Jordan) had observed a man running away from the school
carrying a rifle, "[s]o it [the conviction] would get thrown out of
court."

[4] The warrant stated that the police would be authorized

[t]o monitor, listen to, and tape record by use of a body
transmitter or other recording device, any and all voice com-
munications or conversations either in person or telephonically
by and between the suspect, Dub Collins, and the informant,
Earl Jordan . . . for a ten (10) day period . . . .

[5] According to preliminary examination testimony by Jordan, he
asked defendant in this telephone conversation what he (Jordan)
would have to do if he were to be a witness in the criminal proceeding
involving defendant's wife. Defendant replied that Jordan would have
to lie. Defendant also offered to pay Jordan $100 (of the $500 total)
later that same day.

[6] Jordan testified that while he was in defendant's automobile,
defendant traced the route which he wanted Jordan to tell the judge

In circuit court, defendant moved to suppress the recorded evidence, asserting invalidity of the warrant. The judge ordered suppression on the authority of *Beavers* after determining that the affidavit provided to support the warrant did not conform to statutory requirements as determined by *People v Sherbine,* 421 Mich 502; 364 NW2d 658 (1984).[7] On appeal, the Court of Appeals ordered briefing of the issue "whether a search warrant was required to listen to conversations where one party to the conversations consented to the recording." However, finding the warrant defective and the case controlled by *Beavers,* the Court of Appeals affirmed the circuit court's decision.[8] We then granted leave to appeal. 434 Mich 900 (1990).

In this appeal the people do not challenge the ruling below that the warrant was invalid. However, we are urged to reconsider this Court's holding in *Beavers.*[9]

II

We begin our analysis with an overview of the

he took the night defendant's wife reported the shooting. Defendant told Jordan that he should tell the judge he saw a man carrying a rifle across the road.

[7] MCL 780.653; MSA 28.1259(3), as interpreted by this Court in *Sherbine,* required that an affidavit supporting a warrant be based on "reliable" information supplied by a "credible person." It is noteworthy that subsequent to the circuit court's decision in this case, the statute was amended, 1988 PA 80, to provide that when an informant is named, the affidavit need only contain "affirmative allegations from which the magistrate may conclude that the person spoke with personal knowledge of the information."

[8] Unpublished opinion per curiam of the Court of Appeals, decided March 22, 1989 (Docket No. 103047).

[9] In the alternative, the people argue that we should avoid the *Beavers* result by fashioning a "good faith" exception to the exclusionary rule upon the basis of the rationale found in *United States v Leon,* 468 US 897; 104 S Ct 3405; 82 L Ed 2d 677 (1984). Since we reverse on other grounds, we do not consider this argument.

law pertaining to electronic surveillance as it had developed prior to April 7, 1975, the date when *Beavers* was decided by this Court over the vigorous dissent of Chief Justice COLEMAN.

### A

Before the advent of radio, telegraph, and the telephone, eavesdropping was treated as a common-law nuisance.[10] As Blackstone explained over two hundred years ago, the term then referred to the practice of listening "under walls or windows, or the eaves of a house, to hearken after discourse, and thereupon to frame slanderous and mischievous tales . . . ."[11]

It is clear that eavesdropping was not the concern which motivated those who drafted and adopted the Fourth Amendment. Rather, they were reacting to the use of force by British officers under the guise of general warrants and writs of assistance to carry on unlimited searches of private homes.[12] It is not surprising then that the words employed by the drafters of the Fourth Amendment focus upon things tangible—the right of people to be secure "in their persons, houses, papers, and effects" against unreasonable searches and seizures.

In the first case involving electronic eavesdropping to come before the United States Supreme Court, *Olmstead v United States,* 277 US 438, 466; 48 S Ct 564; 72 L Ed 944 (1928), federal agents had obtained evidence against an accused bootlegger by tapping the telephone wire outside his home with-

[10] 4 Blackstone, Commentaries, p 168. See also *Berger v New York,* 388 US 41, 45; 87 S Ct 1873; 18 L Ed 2d 1040 (1967).

[11] Blackstone, n 10 *supra.*

[12] Spritzer, *Electronic surveillance by leave of the magistrate: The case in opposition,* 118 U Pa L R 169, 170 (1969).

out a warrant and without the consent of either party to the intercepted conversation. Finding that there had been no physical trespass into a constitutionally protected area, the Court concluded that Fourth Amendment protection against search and seizure was not implicated. Declining to attribute any "enlarged or unusual meaning" to the words employed, the Court reasoned that the Fourth Amendment had been designed to protect citizens from searches for "material things—the person, the house, his papers or his effects."[13] However, the *Olmstead* Court, speaking through Chief Justice Taft, expressly recognized that Congress, if it wished to do so, could regulate the use of wiretap evidence in criminal trials. 277 US 464.

Later, the distinction between nonconsensual electronic surveillance (where none of the parties to a monitored conversation has consented), as in *Olmstead,* and participant monitoring (where one of the conversants is a consenting participant) was brought into sharp focus in *On Lee v United States,* 343 US 747; 72 S Ct 967; 96 L Ed 1270 (1952), and in *Lopez v United States,* 373 US 427; 83 S Ct 1381; 10 L Ed 2d 462 (1963).

In *On Lee,* a police officer listened outside with a radio receiver while a conversation took place within the defendant's laundry between the defendant and a former employee who, in coöperation with the police, wore a concealed wireless transmitter. Finding no trespass, because the former employee had gained entrance to the laundry with the defendant's consent, the Court ruled that the Fourth Amendment was not implicated. The Court took pains, however, to distinguish the participant monitoring in this case from the nonconsensual

---

[13] Justice Holmes dissented and wrote, "We have to choose, and for my part I think it a less evil that some criminals should escape than that the Government should play an ignoble part." 277 US 470.

wiretapping in *Olmstead*. Foreshadowing, perhaps, its later shift to an "expectation of privacy" standard, the Court reasoned that the defendant

> was talking confidentially and indiscreetly with one he trusted, and he was overheard. This was due to aid from a transmitter and receiver, to be sure, but with the same effect *on his privacy* as if [the police officer with the radio receiver] had been eavesdropping outside an open window. [343 US 753-754. Emphasis added.]

In *Lopez,* the defendant attempted to bribe an agent of the Internal Revenue Service. Later, the agent obtained incriminating evidence which was offered at trial by using a concealed device to tape-record a conversation with the defendant in the latter's office. Finding no trespass because the agent had been invited into the defendant's office, the Court ruled that the warrantless recording did not offend the Fourth Amendment. The Court stressed that the agent could have testified about the conversation even if it had not been taped, and stated:

> Stripped to its essentials, [the defendant's] argument amounts to saying that he has a constitutional right to rely on possible flaws in the agent's memory, or to challenge the agent's credibility without being beset by corroborating evidence that is not susceptible of impeachment. For no other argument can justify excluding an accurate version of a conversation that the agent could testify to from memory. We think the risk that [the defendant] took in offering a bribe to [the agent] fairly included the risk that the offer would be accurately reproduced in court, whether by faultless memory or mechanical recording. [373 US 439.]

Although *Hoffa v United States,* 385 US 293; 87

S Ct 408; 17 L Ed 2d 374 (1966), did not involve participant monitoring, as will be seen, the reasoning employed would prove to be crucial in the Court's subsequent analysis of the participant monitoring issue. In this case, a close associate of defendant Hoffa decided to become a government informant. While posing as Hoffa's friend, the informant was invited into Hoffa's hotel suite and became privy to conversations involving plans to bribe jurors in an upcoming trial. Rejecting a Fourth Amendment challenge to the informant's subsequent testimony, the Court said,

> Neither this Court nor any member of it has ever expressed the view that the Fourth Amendment protects a wrongdoer's misplaced belief that a person to whom he voluntarily confides his wrongdoing will not reveal it. [385 US 302.]

As Justice BOYLE later observed in *People v Catania*, 427 Mich 447, 456; 398 NW2d 343 (1986), "The *Hoffa* opinion essentially held that citizens assume the risk that their associates may be undercover agents."

Finally, in *Katz v United States*, 389 US 347, 353; 88 S Ct 507; 19 L Ed 2d 576 (1967), the Court abandoned its *Olmstead* rationale and declared that "the 'trespass' doctrine there enunciated can no longer be regarded as controlling."[14] In that case, federal agents attached a listening and recording device to the outside of a public telephone booth, and evidence of the defendant's end of telephone conversations, overheard electronically

---

[14] The underpinnings of *Olmstead* had been eroded prior to *Katz*. For example, see *Warden v Hayden*, 387 US 294, 304; 87 S Ct 1642; 18 L Ed 2d 782 (1967); *Wong Sun v United States*, 371 US 471; 83 S Ct 407; 9 L Ed 2d 441 (1963); *Silverman v United States*, 365 US 505; 81 S Ct 679; 5 L Ed 2d 734 (1961); *Jones v United States*, 362 US 257; 80 S Ct 725; 4 L Ed 2d 697 (1960).

without the knowledge of defendant or any of those with whom he spoke, was admitted at trial.

Finding this activity unconstitutional in the absence of a warrant, the *Katz* Court declared that "the Fourth Amendment protects people, not places," 389 US 351, and stressed that its reach "cannot turn upon the presence or absence of a physical intrusion into any given enclosure." 389 US 353. Shifting its analytical focus, the Court declared that Fourth Amendment interests are implicated when the government infringes upon an individual's justifiable or legitimate expectation of privacy. The test which emerged from *Katz* for determining when an expectation of privacy is constitutionally justifiable was articulated by Justice Harlan in his *Katz* concurrence:[15]

> [T]here is a twofold requirement, first that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as "reasonable." [389 US 361.][16]

Shortly after the *Katz* decision, Congress debated and passed the Omnibus Crime Control and Safe Streets Act of 1968, 18 USC 2510 *et seq.,* which includes title III, legislation designed to regulate and make available to law enforcement personnel the use of wiretapping as a tool in the battle against organized crime.[17] Significantly, Con-

[15] See *United States v Knotts,* 460 US 276; 103 S Ct 1081; 75 L Ed 2d 55 (1983) (explaining the *Katz* test).

[16] In *People v Smith,* 420 Mich 1; 360 NW2d 841 (1984), this Court adopted the *Katz* test for purposes of determining the interests protected by Const 1963, art 1, § 11.

[17] S Rep No 1097, 90th Cong (2nd Sess), reprinted in 1968 US Code Cong & Admin News 2112, 2153-2157. See also *id.* at 2284-2285 (individual views of Senators Dirksen, Hruska, Scott, and Thurmond); *United States v United States Dist Court for the Eastern Dist of Michigan,* 407 US 297, 302; 92 S Ct 2125; 32 L Ed 2d 752 (1972).

gress drew a sharp distinction between two types of law enforcement activity: (1) nonconsensual electronic surveillance (where none of the parties to a conversation has consented), and (2) participant monitoring (where one of the conversants is a consenting participant). While Congress in title III recognized the Fourth Amendment's application to nonconsensual electronic surveillance (as in *Olmstead* and *Katz*), it imposed no restrictions on participant monitoring (as in *On Lee, Lopez,* and *Beavers*). Indeed, title III expressly exempts participant monitoring from the scope of its regulation:

> It shall *not* be unlawful under this chapter for a person acting under color of law to intercept a wire, oral, or electronic communication, where such person is a party to the communication or one of the parties to the communication has given prior consent to such interception. [18 USC 2511(2)(c). Emphasis added.][18]

Of course, the recognition by Congress of this distinction did not remove participant monitoring from constitutional scrutiny, and in the wake of *Katz* the question remained whether *On Lee* and *Lopez* were still viable.[19]

It was not long after the enactment of title III, however, that the Supreme Court took up and considered the effect of *Katz* upon participant monitoring. In *United States v White,* 401 US 745; 91 S Ct 1122; 28 L Ed 2d 453 (1971), conversations related to the sale of narcotics between a police informant and the defendant in the latter's home were electronically monitored with the informant's

---

[18] Congress considered participant monitoring and recording to be an indispensable tool in criminal investigations. S Rep, n 17 *supra* at 2183, 2286.

[19] Compare, e.g., *United States v Jones,* 292 F Supp .1001 (D DC, 1968), and cases cited therein, with *United States v Kaufer,* 406 F2d 550 (CA 2, 1969).

coöperation. Four members of a sharply divided Court, speaking through Justice White, declared that *On Lee* and *Lopez* were still good law.[20] After noting the absence in *Katz* of a consenting participant, the *White* plurality[21] reasoned from the *Hoffa* "assumed risk" analysis and concluded that because the defendant had no "justifiable and constitutionally protected expectation that a person with whom he is conversing will not then or later reveal the conversation to the police" (401 US 749), the defendant similarly had no justifiable expectation that such conversations would not be monitored or recorded.

Justice White explained:

> Concededly a police agent who conceals his police connections may write down for official use his conversations with a defendant and testify concerning them, without a warrant authorizing his encounters with the defendant and without otherwise violating the latter's Fourth Amendment rights. *Hoffa v United States,* 385 US 300-303. For constitutional purposes, no different result is required if the agent instead of immediately reporting and transcribing his conversations with defendant, either (1) simultaneously records them with electronic equipment which he is carrying on his person, *Lopez v United States, supra;* [or] (2) . . . carries radio equipment which simultaneously transmits the conversations either to recording equipment located elsewhere or to other agents monitoring the transmitting frequency. *On Lee v United States, supra.* If the conduct and revelations of an agent operating without electronic equipment do not invade the defendant's constitutionally justifiable expectations of privacy, neither

---

[20] Chief Justice Burger and Justices Stewart and Blackmun joined in the opinion of Justice White.

[21] Justice Black concurred in the plurality's result, but he did so on the ground that intangibles such as conversations are beyond the scope of the Fourth Amendment.

does a simultaneous recording of the same conversations made by the agent or by others from transmissions received from the agent to whom the defendant is talking ·and whose trustworthiness the defendant necessarily risks. [401 US 751.]

Four justices, each writing separately, expressed a contrary view that warrantless electronic monitoring, though consented to by one of the parties to the conversation, violates the Fourth Amendment.[22] Dissenting, Justice Harlan reasoned that this activity

goes beyond the impact on privacy occasioned by the ordinary type of "informer" investigation . . . . Much off-hand exchange is easily forgotten and one may count on the obscurity of his remarks, protected by the very fact of a limited audience, and the likelihood that the listener will either overlook or forget what is said . . . . All these values are sacrificed by a rule of law that permits official monitoring of private discourse . . . . [401 US 787-789.]

As a result of the six-opinion division in *White,* the validity of *Lopez* and *On Lee* continued to be challenged in the lower federal courts. See, e.g., *United States v Santillo,* 507 F2d 629 (CA 3, 1975).

B

It was against this unsettled backdrop that the *Beavers* case came before our Court. There, a police informant, who wore a concealed radio transmitter, knocked on the rear door of the defendant's apartment. When the defendant appeared, the two engaged in a conversation which culminated in the sale of heroin. Later, a police officer,

---

[22] Justices Brennan, Marshall, Douglas, and Harlan.

who remained in a nearby unmarked car and listened to the conversation with the aid of a radio receiver, was allowed to testify regarding the defendant's statements. Contending that *Katz, supra,* had expanded the right of privacy to preclude such monitoring activity in the absence of a warrant, the defendant argued that his constitutionally protected right to be free from unreasonable search and seizure had been violated.

The *Beavers* Court agreed with the defendant's position and rationalized its decision by focusing exclusively on federal case law. Its analysis cited no Michigan authority, it made no reference to the history of the adoption of art 1, § 11 of the Michigan Constitution, and it placed no reliance on textual differences between the state and federal constitutions. Nevertheless, the Court stated that "[w]hile the result reached today reflects an analysis of Federal case authority, our conclusion is based upon the Michigan Constitution . . . ." 393 Mich 567-568.

Recognizing that the "identical issue" had been before the United States Supreme Court in the then recent case of *United States v White, supra,* the *Beavers* Court stressed that only three other justices had joined in the opinion by Justice White, and that four justices had registered strong disagreement. After reviewing the reasoning of Justices White and Harlan, the *Beavers* Court declared its preference for the latter's position,

> which recognizes a significant distinction between assuming the risk that communications directed to one party may subsequently be repeated to others and the simultaneous monitoring of a conversation by the uninvited ear of a third party functioning in coöperation with one of the participants yet unknown to the other. [393 Mich 565.]

The *Beavers* majority agreed with Justice Harlan that

> one's expectation of privacy should not be subjected to the possibility that communications directed to particular persons are simultaneously being intercepted by a third party [and] that such investigatory action constitutes a search and seizure which can be constitutionally justified only if a valid search warrant is issued. [*Id.,* p 564.]

For several years following *Beavers,* the sharp division registered among members of the *White* Court continued to cast doubt upon the constitutionality of participant monitoring.[23] However, in 1979, any lingering uncertainty was finally put to rest when the Supreme Court decided *United States v Caceres,* 440 US 741; 99 S Ct 1465; 59 L Ed 2d 733 (1979). There, the defendant sought reversal of his conviction for bribing an IRS agent after the agent, without a warrant, wore a concealed radio transmitter which allowed conversations between the two to be monitored and recorded by another agent not present in the room. Writing for a majority of seven, Justice Stevens first noted that

> [w]hile Title III of the Omnibus Crime Control and Safe Streets Act . . . regulates electronic surveillance conducted without the consent of either party to a conversation, federal statutes impose no restrictions on recording a conversation with the consent of one of the conversants. [440 US 750.]

Then, he added, "Nor does the Constitution protect the privacy of individuals in respondent's position."

---

[23] See, e.g., *People v Drielick,* 400 Mich 559, 564; 255 NW2d 619 (1977) (addressing whether *White* was binding as a matter of federal law).

Referring to *Lopez, supra,* Justice Stevens continued,

> [there] we held that the Fourth Amendment provided no protection to an individual against the recording of his statements by the IRS agent to whom he was speaking. In doing so, we repudiated any suggestion that the defendant had a "constitutional right to rely on possible flaws in the agent's memory, or to challenge the agent's credibility without being beset by corroborating evidence that is not susceptible of impeachment," concluding instead that "the risk that petitioner took in offering a bribe . . . fairly included the risk that the offer would be accurately reproduced in court, whether by faultless memory or mechanical recording." The same analysis was applied in *United States v White,* 401 US 745, to consensual monitoring and recording by means of a transmitter concealed on an informant's person, even though the defendant did not know that he was speaking with a Government agent . . . . [*Id.*][24]

In the light of *Caceres,* which made crystal clear that the Fourth Amendment requires no warrant in the circumstances of the case now before us, we turn to reconsider whether greater restrictions on law enforcement activities are required by the Michigan Constitution.[25]

---

[24] See also *Smith v Maryland,* 442 US 735; 99 S Ct 2577; 61 L Ed 2d 220 (1979) (citing *White* with approval) and *United States v Karo,* 468 US 705, 716, n 4; 104 S Ct 3296; 82 L Ed 2d 530 (1984) (citing *White* for the proposition that there is a significant distinction between eavesdropping with the consent of a party to the conversation and eavesdropping without the knowledge or consent of either party).

[25] Note is taken of the people's argument that *Beavers* does not control this case because defendant's words were recorded, as well as monitored. While the *Beavers* Court sought to limit its ruling so as not to encompass "those situations which include a participant himself *recording* the conversation," 393 Mich 562, n 2 (emphasis in original), we agree with the United States Supreme Court that there is no significant constitutional distinction between participant monitoring and participant recording. See *United States v Caceres,* and *Lopez v United States, supra.*

III

US Const, Am IV provides:

> The right of the people to be secure in their
> persons, houses, papers, and effects, against unrea-
> sonable searches and seizures, shall not be vio-
> lated, and no Warrants shall issue, but upon prob-
> able cause, supported by Oath or affirmation, and
> particularly describing the place to be searched,
> and the persons or things to be seized.

Const 1963, art 1, § 11 provides:

> The person, houses, papers and possessions of
> every person shall be secure from unreasonable
> searches and seizures. No warrant to search any
> place or to seize any person or things shall issue
> without describing them, nor without probable
> cause, supported by oath or affirmation. The provi-
> sions of this section shall not be construed to bar
> from evidence in any criminal proceeding any
> narcotic drug, firearm, bomb, explosive or any
> other dangerous weapon, seized by a peace officer
> outside the curtilage of any dwelling house in this
> state.

A

Discerning the intent of the framers and the
people who adopted Const 1963, art 1, § 11, this
Court has held, in a line of decisions since *Bea-
vers*, that art 1, § 11 is to be construed to provide
the same protection as that secured by the Fourth
Amendment, absent "compelling reason" to impose
a different interpretation.[26]

In the leading case of *People v Nash,* 418 Mich
196, 209; 341 NW2d 439 (1983) (opinion of BRICK-

---

[26] *People v Perlos,* 436 Mich 305; 462 NW2d 310 (1990); *People v
Chapman,* 425 Mich 245; 387 NW2d 835 (1986); *People v Catania,
supra; People v Smith,* n 16 *supra; People v Nash,* 418 Mich 196; 341
NW2d 439 (1983).

LEY, J.),[27] this Court extensively reviewed the history of the adoption of Const 1963, art 1, § 11 and found its wording and purpose to be substantially the same as its predecessor, Const 1908, art 2, § 10, as amended. Originally, the 1908 version included no antiexclusionary proviso similar to that found in the third sentence of the current version.[28] However, as the *Nash* Court recounted, following a 1933 decision by this Court which excluded from evidence an illegally seized weapon,[29] the people reacted swiftly by adding a proviso for the obvious purpose of restricting the judiciary's use of its exclusionary rule.[30]

---

[27] A majority of the Court concurred in Justice BRICKLEY's opinion concerning the history of Const 1963, art 1, § 11 and his analysis regarding the interpretation of that provision.

[28] Const 1908, art 2, § 10, as originally adopted, provided:

The person, houses, papers and possessions of every person shall be secure from unreasonable searches and seizures. No warrant to search any place or to seize any person or things shall issue without describing them, nor without probable cause, supported by oath or affirmation . . . .

[29] In *People v Stein*, 265 Mich 610; 251 NW 788 (1933), the Court reversed the defendant's conviction for carrying an unlicensed weapon, ruling that the weapon had to be excluded from evidence because it was unconstitutionally seized. Three years later the people of Michigan amended the constitution, adding what is now the third sentence of art 1, § 11 to provide that the judicially crafted exclusionary rule was not to be applied to certain types of evidence, including weapons, seized outside the curtilage of the home.

[30] 1935 Joint Resolution No 2, ratified November 3, 1936, reads as follows:

Provided, however, That the provisions of this section shall not be construed to bar from evidence in any court of criminal jurisdiction, or in any criminal proceeding held before any magistrate or justice of the peace, any firearm, rifle, pistol, revolver, automatic pistol, machine gun, bomb, bomb shell, explosive, blackjack, slungshot, billy, metallic knuckles, gas-ejecting device, or any other dangerous weapon or thing, seized by any peace officer outside the curtilage of any dwelling house in this state.

As the *Nash* Court found, there is no evidence that those who later framed and adopted the 1963 Constitution had any intention of expanding the protection provided under Michigan's search and seizure provision beyond that secured by the Fourth Amendment of the federal constitution. In his review, Justice BRICKLEY explained that when art 1, § 11 was under consideration by delegates to the 1961 convention, the focus of their concern was on the effect of the then recently decided case of *Mapp v Ohio,* 367 US 643; 81 S Ct 1684; 6 L Ed 2d 1081 (1961), which required the states to apply the exclusionary rule to Fourth Amendment violations in all cases. Fearing that *Mapp* had invalidated the third sentence of Const 1908, art 2, § 10, the Committee on Declaration of Rights, Suffrage, and Elections proposed at one point that the following language be substituted for that portion: " 'Evidence obtained in violation of this section shall not be used except as authorized by law.' " 418 Mich 211. Far from attempting to expand the protection of the state's constitutional provision, the committee preferred the substitute language because it would permit "the possibility of a less stringent application of the exclusionary rule if allowed by federal law . . . ."[31]

Ultimately, the convention rejected the committee's proposal, as well as other proposals for substantive changes in the search and seizure provision then in effect.[32] Choosing to retain the third sentence aimed at the exclusionary rule, the convention made only stylistic improvements in the

[31] 418 Mich 212 (quoting Committee Proposals and Reports, Constitutional Convention 1961, Supporting Report, Committee Proposal No 15, pp 7, 10).

[32] The convention's address to the people stated that art 1, § 11 represented "No change from Sec. 10, Article II, of the present constitution except for improvement in phraseology." 2 Official Record, Constitutional Convention 1961, p 3364.

wording of art 1, § 11 before adopting and recommending it to the people.[33]

In the light of this history, as explained by Justice BRICKLEY, "the common understanding of the people upon reading the proposed constitutional provision could be nothing but the belief that the search and seizure provision of the new constitution represented no change." 418 Mich 213. The *Nash* Court concluded:

> There is no indication that in readopting the language of Const 1908, art 2, § 10 in Const 1963, art 1, § 11 the people of this state wished to place restrictions on law enforcement activities greater than those required by the federal constitution. In fact, the contrary intent is expressed. [*Id.*]

While recognizing that this Court may, where justified, construe our state constitution so as to impose different requirements than obtain under parallel provisions of the federal constitution, the *Nash* Court stressed that, "The history of Const 1963, art 1, § 11, and its plain import . . . suggest that its further expansion, with the concomitant expansion of the exclusionary rule to enforce it, *should occur only when there is a compelling reason to do so.*" 418 Mich 214 (emphasis added).

In decisions since *Nash,* this Court has adhered

---

[33] Insight concerning the decision to retain the antiexclusionary language was revealed in remarks delivered by the delegate who proposed readoption of the provision:

> The time is now and the place is here to retain in our constitution in improved form the proviso which will protect the law-abiding citizen and the law enforcement officer.
>
> Should this proviso later be struck down by the courts as violative of the federal constitution the resulting license of the hoodlum, the burglar, the highwayman, the bank robber, and the narcotics peddler, will be chargeable to those courts and not to this convention. [1 Official Record, Constitutional Convention 1961, p 496 (remarks of Delegate Kenneth Prettie).]

to the "compelling reason" standard in determining whether Const 1963, art 1, § 11 imposes requirements not encompassed by the Fourth Amendment.[34] Furthermore, this Court has looked to *Nash* for guidance in construing other provisions of the Michigan Constitution which parallel federal constitutional guarantees.[35]

B

Although the reasoning of Justice White in *United States v White, supra,* was not preferred at the time by a *Beavers* majority, it is noteworthy that this Court later adopted the *Hoffa* principle upon which that reasoning rested. In *People v*

[34] *People v Smith,* n 16 *supra* at 20 (no compelling reason that Const 1963, art 1, § 11 requires a standing requirement, for purposes of challenging the admissibility of evidence seized without a warrant, more liberal than that mandated by the United States Supreme Court's interpretation of the Fourth Amendment); *People v Catania, supra* (plurality decision which followed the analysis set forth in *Nash, supra,* in holding that art 1, § 11 did not require suppression of evidence seized pursuant to a warrantless "ruse" entry by an undercover police agent into the defendant's home because parallel federal constitutional provisions had been interpreted to permit the use of such evidence); *People v Perlos,* n 26 *supra* (MCL 257.625a[9]; MSA 9.2325[1][9] which permits chemical analysis of blood samples taken from a driver of a motor vehicle involved in an accident to be admitted into evidence in a subsequent criminal prosecution arising out of such accident, does not violate the Fourth Amendment of the federal constitution and there is "no compelling reason" to afford greater protection under Const 1963, art 1, § 11).

[35] *People v Collier,* 426 Mich 23, 39; 393 NW2d 346 (1986) (no compelling reason to construe the due process and self-incrimination provisions of Const 1963, art 1, § 17 in a manner differently than the parallel provisions of the federal constitution); *People v Hill,* 429 Mich 382, 393; 415 NW2d 193 (1987) (no compelling reason to interpret Const 1963, art 1, § 17 to require *Miranda* warnings when the suspect becomes the focus of an investigation where parallel provision of the federal constitution had been interpreted to require warnings only when an individual is taken into custody), *Miranda v Arizona,* 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

Concerning evidence which is enumerated in the third sentence of art 1, § 11, this Court has held that we may not, under any circumstances, interpret the Michigan Constitution to afford greater protection to defendants than the Fourth Amendment. *People v Chapman,* n 26 *supra* at 254-255.

*Catania, supra,* after an undercover police informant feigned car trouble and asked to use the telephone, she was invited by the defendant into his home. While there, the informant was asked by the defendant to join him in smoking marijuana. Later, defendant sought, on Fourth Amendment and state constitutional grounds, to suppress evidence of this and other activity observed by the informant in the defendant's home which led to convictions for possession with intent to deliver cocaine[36] and marijuana.[37] Writing for a plurality,[38] Justice BOYLE concluded that

> where entry by an undercover agent is effected solely by the invitation of the defendant, albeit under a misconception as to the agent's identity and purpose, there is no Fourth Amendment or Const 1963, art 1, § 11, activity so long as the agent does not exceed the scope of the invitation.

Citing with approval the decision in *United States v White,* Justice BOYLE observed that the lead opinion of Justice White had

> affirmed the validity of *Hoffa's* conclusion that citizens assume the risk that their associates may be government informants and that communications made to such agents are not within the protection of the Fourth Amendment . . . . [427 Mich 458-459.]

After finding no Fourth Amendment violation,

---

[36] MCL 333.7401(1), (2)(a)(iv); MSA 14.15(7401)(1), (2)(a)(iv).

[37] MCL 333.7401(1), (2)(c); MSA 14.15(7401)(1), (2)(c). The defendant was also convicted as a second felony offender. MCL 333.7413; MSA 14.15(7413).

[38] 427 Mich 454. Justice RILEY and Chief Justice WILLIAMS concurred in the lead opinion of Justice BOYLE. Justice BRICKLEY concurred in the result only. Justice LEVIN also concurred in the result, but on the basis that the issue presented was one of entrapment rather than search and seizure.

the *Catania* Court also determined that "[t]here is
no basis in this case for holding that the Michigan
Constitution, art 1, § 11, permits greater protection
than the United States Constitution." Noting that
in *People v Smith, supra,* this Court had adopted
the *Katz* "reasonable expectation of privacy" stan-
dard "to define the interests protected under Const
1963, art 1, § 11," Justice BOYLE reasoned that the
defendant in *Catania* had no reasonable expecta-
tion of privacy because he "assumed a risk when
he offered drugs to a total stranger that she [the
informant] would communicate what she saw to
the world. Since no persuasive reason [was] ad-
vanced to interpret Const 1963, art 1, § 11 as
prohibiting the activities allowed . . . under the
Fourth Amendment," the Court declined to place a
different construction upon the parallel provision
of the Michigan Constitution. 427 Mich 466-467.

IV

In the light of *Nash* and its progeny, we turn
now to consider whether in this case there is
compelling reason to construe Const 1963, art 1,
§ 11 to prohibit law enforcement activity· that
otherwise is permissible under the Fourth Amend-
ment. Although a number of appellate decisions
have referred to the compelling reason standard,
little in the way of guidance has been provided
concerning its contours and meaning.[39] Surely, the

[39] In *Catania,* Justice BOYLE noted that the Washington Supreme
Court has suggested the following factors for consideration in deter-
mining whether a state constitution affords protection different from
the federal constitution: 1) the textual language of the state constitu-
tion, 2) significant textual differences between parallel provisions of
the two constitutions, 3) state constitutional and common-law history,
4) state law preëxisting adoption of the relevant constitutional provi-
sion, 5) structural differences between the state and federal constitu-
tions, and 6) matters of peculiar state or local interest. 427 Mich 466,
n 12.

beginning of consideration must be the axiomatic statement of this Court in *Holland v Garden City Clerk,* 299 Mich 465, 470; 300 NW 777 (1941): "It is a fundamental principle of constitutional construction that we determine the intent of the framers of the Constitution and of the people adopting it." See also *Burdick v Secretary of State,* 373 Mich 578, 584; 130 NW2d 380 (1964).

We believe that compelling reason for an independent state construction might be found if there were significant textual differences between parallel provisions of the state and federal constitutions, and, particularly, if history provided reason to believe that those who framed and adopted the state provision had a different purpose in mind. As already noted, the *Beavers* majority placed no reliance upon textual differences between the two constitutions. Moreover, the language of art 1, § 11 is substantially similar to that of the Fourth Amendment, except for the antiexclusionary proviso in the third sentence of § 11.

This textual difference, however, is the basis of an argument advanced by defendant. Pointing to the fact that the antiexclusionary language in § 11 mentions only certain items which are declared to be admissible in evidence, defendant contends that the failure to mention other items, such as conversations, must indicate an intent to afford the omitted items greater protection under our state constitution. However, this argument was rejected in *Nash,* where Justice BRICKLEY explained, "Considering the history and language of Const 1963, art 1, § 11, it would be an incredible act of illogic" to hold that there is a heightened standard regarding evidence not enumerated by art 1, § 11. 418 Mich 214.[40] As earlier noted, the historical record clearly

---

[40] We are also urged by the people to distinguish *Beavers* on the

indicates that the people of Michigan had no intention of imposing more stringent restrictions upon law enforcement than is mandated by the Fourth Amendment. 418 Mich 213.

One state, Alaska, found compelling reason for independent treatment of participant monitoring in the fact that its state constitution contains a separate provision which specifically protects a right of privacy.[41] The Alaska Supreme Court concluded that its privacy right provision "affords broader protection than the penumbral right inferred from other constitutional provisions." *State v Glass,* 583 P2d 872, 879 (Alas, 1978).[42] Significantly, the Michigan Constitution contains no sim-

---

basis that the conversations monitored there occurred within defendant's home. We decline to do so. Although it is well settled that the home is accorded the full range of Fourth Amendment protection, *Lewis v United States,* 385 US 206, 211; 87 S Ct 424; 17 L Ed 2d 312 (1966), the Fourth Amendment protects people, not places. "What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." *Katz,* 389 US 351. The United States Supreme Court has found no distinction between electronic surveillance conducted within or without the curtilage of defendant's home. *White,* 401 US 757 (no distinction between conversations monitored in defendant's home, informant's home, informant's automobile, and a restaurant). Even if a person's home is where he has the most reasonable expectation of privacy, that expectation is no longer reasonable when the home becomes a site for planning criminal activity. *Lewis,* 385 US 211. See also *Lee v State,* 489 So 2d 1382, 1386 (Miss, 1986).

[41] Art 1, § 22 of the Alaska Constitution provides:

The right of the people to privacy is recognized and shall not be infringed. The legislature shall implement this section.

[42] Cf. *State v Lester,* 64 Hawaii 659, 665; 649 P2d 346 (1982), where, despite a state constitutional right of privacy provision, the Hawaii Supreme Court, reasoning that a person assumes the risk that his confidant will broadcast his words, rules that there was no "compelling reason" to impose a warrant requirement under Hawaii's search and seizure provision.

See also *State v Brown,* 232 Mont 1; 755 P2d 1364 (1988), and *State v Reeves,* 427 So 2d 403 (La, 1982), wherein the Supreme Courts of Montana and Louisiana reached a result similar to Hawaii despite a specific state constitutional guarantee of a right of privacy.

ilar separate provision explicitly protecting a right of privacy.

In this appeal, defendant also argues that the availability of warrantless participant monitoring would chill the free speech rights of the law abiding public.[43] This echoes a concern expressed by the *Beavers* Court when it said, "Our laws must ensure that the ordinary, law-abiding citizen may continue to engage in private discourse, free to speak with the uninhibited spontaneity that is characteristic of our democratic society." 393 Mich 566.

While such a concern is understandable, we have not been made aware of any evidence that the feared abuses have materialized either on the federal level or in those states which have no constitutional warrant requirement. Moreover, there is every reason to believe that citizen discourse continues to be as free and uninhibited as ever, even in the overwhelming majority of states which have followed the federal lead on this issue. In addition, the force of the "chilling effect" argument is undermined by the fact that for at least twenty years, the less restrictive federal standard has been applicable in Michigan and in all other states to federal law enforcement personnel.[44] Finally, we emphasize that nothing in our decision

---

[43] See, e.g., *White,* 401 US 768 (Harlan, J., dissenting).

[44] As noted, 18 USC 2511(2)(c) sanctions participant monitoring. Further, 18 USC 2517(3) provides:

> Any person who has received, by any means authorized by this chapter [18 USC 2510 *et seq.*], any information concerning a wire, oral, or electronic communication, or evidence derived therefrom intercepted in accordance with the provisions of this chapter [18 USC 2510 *et seq.*] may disclose the contents of that communication *or* such derivative evidence while giving testimony under oath or affirmation *in any proceeding held under the authority* of the United States or *of any State or political subdivision thereof.* [Emphasis added.]

today will preclude the Legislature from adopting such controls and restraints, including restrictions on the use of evidence, as might be considered necessary to guard against the arbitrary or capricious use within the state system of this investigative technique.[45]

It is noteworthy that of the fifty states, only two others, Alaska[46] and Massachusetts,[47] interpret their state constitutions to require a warrant for participant monitoring, while the highest courts in the other twenty-four states in which the issue has been addressed have ruled that their constitutions do not require a warrant.[48] Originally, the Su-

---

[45] MCL 750.539c; MSA 28.807(3) makes it a felony to "wilfully" use "any device to eavesdrop" upon a private conversation without the consent of all participants. While this statute clearly applies to private citizens, it does not prohibit eavesdropping or surveillance "not otherwise prohibited by law by a peace officer or his agent of this state or federal government while in the performance of his duties." MCL 750.539g(a); MSA 28.807(7)(a).

When the statute was enacted as 1966 PA 319, warrantless participant monitoring was not "otherwise prohibited by law." See *On Lee v United States, Lopez v United States, supra, People v Maranian,* 359 Mich 361; 102 NW2d 568 (1960), *People v Sims,* 38 Mich App 127; 195 NW2d 766 (1972), and *People v Karalla,* 35 Mich App 541; 192 NW2d 676 (1971). Only under *Beavers* (decided after the statute was enacted) is such monitoring prohibited. Thus, the statute does not reflect a legislative intent to preclude warrantless participant monitoring by a police officer or his agent while in the performance of his duties.

[46] *State v Glass, supra.*

[47] *Commonwealth v Blood,* 400 Mass 61; 507 NE2d 1029 (1987).

[48] See, e.g., *Hammond v State,* 354 So 2d 280 (Ala Crim App, 1977), *Smithey v State,* 269 Ark 538; 602 SW2d 676 (1980), *People v Phillips,* 41 Cal 3d 29; 222 Cal Rptr 127; 711 P2d 423 (1985), *People v Velasquez,* 641 P2d 943 (Colo, 1982), *State v Grullon,* 212 Conn 195; 562 A2d 481 (1989), *Morningstar v State,* 428 So 2d 220 (Fla, 1982), cert den 464 US 821 (1983), *Green v State,* 250 Ga 610; 299 SE2d 544 (1983), *State v Lester,* n 42 *supra, People v Richardson,* 60 Ill 2d 189; 328 NE2d 260 (1975), *Lawhorn v State,* 452 NE2d 915 (Ind, 1983), *State v Reeves,* n 42 *supra, State v Brown,* n 42 *supra, State v Kilgus,* 128 NH 577; 519 A2d 231 (1986), *Carrier v Commonwealth,* 607 SW2d 115 (Ky App, 1980), *Lee v State,* n 40 *supra, State v Engleman,* 653 SW2d 198 (Mo, 1983), *State v Levan,* 326 NC 155; 388 SE2d 429 (1990), *State v Geraldo,* 68 Ohio St 2d 120; 429 NE2d 141 (1981), *Commonwealth v Blystone,* 519 Pa 450; 549 A2d 81 (1988), *State v Ahmadjian,* 438 A2d 1070 (RI, 1981), *Clariday v State,* 552 SW2d 759

preme Courts of Montana, Pennsylvania, and Louisiana held that their state constitutions required a warrant;[49] however, each of those decisions has now been overruled.[50]

As a number of the state court decisions have emphasized, there are practical considerations which weigh heavily against the imposition of a constitutional warrant requirement. The *Beavers* Court conceded that participant monitoring "is practiced extensively throughout the country and represents a vitally important investigative tool of law enforcement."[51]

As reported by a national commission formed by Congress to evaluate the electronic surveillance provisions of the Omnibus Crime Control and Safe Streets Act,[52] participant monitoring is often crucial in establishing the credibility of an informant and probable cause.[53] Since "not all crimes are

(Tenn Crim App, 1976), *State v Boone,* 581 P2d 571 (Utah, 1978), and *Blackburn v State,* 290 SE2d 22 (W Va, 1982).

We further note that the American Bar Association has approved the use of participant monitoring by law enforcement personnel without court authorization. ABA Standards Relating to Electronic Surveillance, § 4.1, Approved Draft, 1971.

[49] *State v Brackman,* 178 Mont 105; 582 P2d 1216 (1978); *Commonwealth v Schaeffer,* 370 Pa Super 179; 536 A2d 354 (1987); *State v Reeves,* n 42 *supra.*

[50] *State v Brown,* n 42 *supra; Commonwealth v Blystone,* n 48 *supra; State v Reeves,* n 42 *supra.*

[51] *Beavers, supra,* 393 Mich 566.

[52] Electronic Surveillance, Report of the National Commission for the Review of Federal and State Laws Relating to Wiretapping and Electronic Surveillance, which was established by Congress, PL 90-351, § 804, June 19, 1968.

[53] See also Goldsmith, *The Supreme Court and title III: Rewriting the law of electronic surveillance,* 74 J Crim L & Criminology 1, 46 (1983). According to the author, Congress had "sound tactical reasons" for authorizing warrantless participant monitoring and recording. "Consensual electronic surveillance often was used to protect informants and undercover police officers in cases in which there was no probable cause; indeed, such surveillance was often crucial towards corroborating the reliability of an informant or developing probable cause."

committed in the bright light of day before swarms
of credible and respected citizens," it has been
pointed out that

> it is often necessary for the police to resort to the
> use of informants of dubious character, reliability,
> and credibility. . . . Without tools such as elec-
> tronic participant monitoring to corroborate the
> disclosures of such informants, reasonable suspi-
> cions might never be developed into probable
> cause, lawful arrest, and just conviction. [*Common-
> wealth v Schaeffer,* 370 Pa Super 179, 259; 536
> A2d 354 (1987) (Kelly, J., concurring in part and
> dissenting in part).]

In most cases, the precondition of a warrant
"would require officers to have probable cause to
use a device for obtaining probable cause." In
situations "such as drug transactions, two meet-
ings instead of one would be required: the first to
acquire probable cause, the second to record the
conversation."[54]

Moreover, strict adherence to warrant require-
ments may be impossible in the context of partici-
pant monitoring. For example, MCL 780.655; MSA
28.1259(5) requires that the officer executing the
warrant give the individual from whom the prop-
erty or things are seized a copy of the warrant
"forthwith." If such a requirement were met, of
course, the suspect would be alerted and the pur-
pose of the monitoring would be defeated.[55] Fur-
ther, the warrant must set forth, with particular-

---

[54] Electronic Surveillance, n 52 *supra* at 117.

[55] Amicus curiae suggested during oral argument before this Court
that, generally, the issuing judge enters a clause in the warrant
suppressing service for a certain period of time. We find no statutory
or decisional law in this state approving such a practice which
appears to contravene the statutory requirement that the individual
be served with a copy of the warrant "forthwith."

ity, the items to be seized.[56] Of course, future conversations are nonexistent until they take place. As aptly noted by Chief Justice COLEMAN in her dissent in *Beavers,* "[h]ow does one specifically describe the conversation to be seized?" 393 Mich 581.[57]

Chief Justice COLEMAN further stressed that the very nature of many criminal activities demands quick action. "Otherwise, the 'bird will have flown,' the opportunity to listen to a 'buy' will have been lost." *Id.* Requiring the police to first find a magistrate and then go with the warrant to the scene "is designed for self-defeat." *Id.* Chief Justice COLEMAN noted the particular need for warrantless participant monitoring in drug-related investigations. The police "are charged with risking their own lives to find and arrest the 'purveyors of death,' " and we "encourage citizens to help them." Because of "the inherent necessity for privacy in drug sales and the small size of the product," the police have "a uniquely difficult task." Drug sales may "take place anytime, anywhere, and be invisible to the observer." Thus, the inherent "nature of the illegal traffic demands the use of agents and informants if it is to be con-

---

[56] The Fourth Amendment of the United States Constitution and Const 1963, art 1, § 11 require warrants to "particularly describ[e] the place to be searched, and the persons or things to be seized. . . ." *Berger v New York,* n 10 *supra* at 58; *People v Secrest,* 413 Mich 521; 321 NW2d 368 (1982); *People v Taylor,* 93 Mich App 292; 287 NW2d 210 (1979); *People v Atkins,* 96 Mich App 672, 679; 293 NW2d 671 (1980); *People v Krokker,* 83 Mich App 474, 477; 268 NW2d 689 (1978). MCL 780.654; MSA 28.1259(4) provides, inter alia, that, "[e]ach warrant shall designate and describe the . . . property or thing to be seized."

[57] Absent the availability of participant monitoring to establish probable cause, the police may be unable to secure a valid warrant, virtually assuring a credibility contest at trial between the uncorroborated testimony of the informant and the frequently corroborated testimony of the defendant. In *Beavers,* e.g., the defendant, supported by several witnesses, claimed to be somewhere else at the time of the alleged conversation and drug transaction.

trolled." But, these very agents "may make a 'buy' " and are "met in court by a series of witnesses who swear that the defendant was somewhere else and the purchaser is lying, perhaps to save his own skin. The buyer cannot usually bring anyone with him to verify his testimony. The lone buyer is also in physical danger." 393 Mich 571.

Participant monitoring often serves "to protect the life of the agent or informant. He plays a deadly game and the microphone allows him speedy access to help." 393 Mich 581. In this age of escalating crime, surely these concerns are at least as compelling today.

While participant monitoring does not favor the guilty, it will often protect the innocent. As another state Supreme Court has observed:

> Society seeks to foster truth, not to suppress it. The presence of the electronic transmitter has but one effect. Instead of the informant committing the conversation to memory, a machine tapes each and every sentence of the communication. The machine notes the inflection of the voices and the context in which remarks are made. If the defendant speaks innocently, his own words will exculpate him. However, if he implicates himself, the recordings prevent him from denying his participation in the conversation. Surely, society would not consider reasonable an expectation of privacy which would result in a more inaccurate version of the events in question. [*State v Reeves,* 427 So 2d 403, 418 (La, 1982).]

Benjamin Franklin once cautioned that "[i]f you would keep your secret from an enemy, tell it not to a friend." What a confidant who hears it chooses to do with a secret—whether he whispers it, records it, or broadcasts it—is beyond the control of the teller. We reject the notion that a wrongdoer has a constitutionally protected expec-

tation that his confidant will be unable to repeat with accuracy and credibility the communicated secret. We agree with Justice White that courts should not be "too ready to erect constitutional barriers to relevant and probative evidence which is also accurate and reliable." *White,* 401 US 753.

V

It is our conclusion that the warrantless participant monitoring in this case violated no reasonable expectation of privacy on the part of defendant, and that there is no compelling reason to interpret Const 1963, art 1, § 11 as affording greater protection for this defendant than is provided under the Fourth Amendment.

Accordingly, *Beavers* is overruled, the decision of the Court of Appeals is reversed, and this case is remanded to the circuit court for proceedings consistent with this opinion.

BRICKLEY, BOYLE, and RILEY, JJ., concurred with GRIFFIN, J.

CAVANAGH, C.J. (*dissenting*). Today this Court declares that our state constitution no longer requires either a warrant, probable cause, or even reasonable suspicion to monitor conversations where one party to the conversation consents. Because we have established precedent to the contrary, and because no compelling reasons have been advanced justifying this abandonment of the principle of stare decisis, I dissent.

I

The arguments advanced by the majority are the same as those rejected by the Court when *People v Beavers,* 393 Mich 554; 227 NW2d 511

(1975), was decided. These arguments have not become more persuasive in the last sixteen years and there is no justification for the reversal of a protective constitutional mandate. The basic explanation for overruling *Beavers* is that the United States Supreme Court has held that there is no violation of the Fourth Amendment posed by participant monitoring without a warrant. This is neither a legal nor a logical reason for departing from established precedent.

In a dissent in the recent Supreme Court case of *Payne v Tennessee,* 501 US —; 111 S Ct 2597; 115 L Ed 2d 720, 730 (1991), Justice Marshall, joined by Justice Blackmun, focused on stare decisis. In *Payne,* the Court overruled two recent rulings involving capital punishment and held that juries can consider "victim impact" evidence in the penalty phase of a capital case. Justice Marshall declared that the law and the facts supporting the precedents had remained intact, and that only the personnel of the Court had changed:

> Power, not reason, is the new currency of this Court's decisionmaking. . . . Neither the law nor the facts supporting [overruled opinions] underwent any change in the last four years. Only the personnel of this Court did. [*Id.,* p 748.]

Absent a fundamental change in the law or a difference in the facts of the case, established precedent should prevail. This Court has espoused this position in the past. For example, in *Parker v Port Huron Hosp,* 361 Mich 1, 10; 105 NW2d 1 (1960), the Court stated:

> The rule of stare decisis establishes uniformity, certainty, and stability in the law . . . . Only in the rare case when it is clearly apparent that an error has been made, *or changing conditions result in injustice by the application of an outmoded*

*rule,* should we deviate from following the established rule.[1] [Emphasis added.]

The majority fails to elaborate on any "changing conditions" beyond the shift in the majority view of the United States Supreme Court. In addition, the majority is unable to point out any "injustice" to demonstrate that the warrant requirement of *Beavers* is an "outmoded rule."

In his dissenting opinion in *Payne,* Justice Marshall also stated that "[i]nevitably, this campaign to resurrect yesterday's 'spirited dissents' will squander the authority and the legitimacy of this Court as a protector of the powerless." *Id.,* p 756. Similarly, our Court has a responsibility to protect the rights of the citizens of this state. To argue that our state should allow the intrusion of searches without warrants without any probable cause or even suspicion, merely because parallel federal constitutional provisions have been interpreted to permit the use of such a procedure, is to abdicate this Court's responsibility to examine the rationale of that Court and determine whether it is persuasive. The *Beavers* Court fulfilled its obligation and declared itself unconvinced by the reasoning of the United States Supreme Court. It then ruled that under our state constitution a warrant based on probable cause is required for third-party monitoring of the conversations of others.

In his dissent in *Payne,* Justice Marshall also cautioned against a rule which allows prior precedent to be overturned on the strength of the personal proclivities of individual justices:

---

[1] See also *People v Jamieson,* 436 Mich 61, 79; 461 NW2d 884 (1990) ("It is not necessary for us to announce today what we would do if we were operating on a clean slate, because we are not. Under the doctrine of stare decisis, principles of law deliberately examined and decided by a court of competent jurisdiction become precedent which should not be lightly departed").

This truncation of the Court's duty to stand by its own precedents is astonishing. . . . [T]he majority sends a clear signal that essentially *all* decisions implementing the personal liberties protected by the Bill of Rights and the Fourteenth Amendment are open to reëxamination. . . . [T]he continued vitality of literally scores of decisions must be understood to depend on nothing more than the proclivities of the individuals who *now* comprise a majority of this Court. [*Id.,* pp 752-753. Emphasis in the original.]

The warrant requirement established in *Beavers* by a decisive majority of this Court was reached after deliberate examination and should stand. Even though this Court has traditionally examined United States Supreme Court analyses when interpreting parallel provisions under our state constitution, this does not mean that this Court must follow the United States Supreme Court majority's interpretation of the United States Constitution if that interpretation is unpersuasive on its own merits. This Court is a sovereign, independent judicial body with ultimate authority to interpret Michigan law. We should not endorse the reasoning of a majority of the justices of the United States Supreme Court unless their reasoning is intrinsically persuasive on the merits.

II

Even at the risk of prolixity, a brief overview of the development of this area of the law is helpful in understanding the concepts involved. In *Olmstead v United States,* 277 US 438; 48 S Ct 564; 72 L Ed 944 (1928), the United States Supreme Court allowed a telephone tap, even where no party to the conversation had consented, on the grounds that there had been no physical trespass. Then, in

*On Lee v United States,* 343 US 747; 72 S Ct 967;
96 L Ed 1270 (1952), the Court ruled that there
was no Fourth Amendment violation when a po-
lice officer listened with a radio receiver to a
conversation in the defendant's office between the
defendant and a police informer who wore a con-
cealed transmitter. In *Lopez v United States,* 373
US 427; 83 S Ct 1381; 10 L Ed 2d 462 (1963), the
Court held that recording without a warrant did
not offend the Fourth Amendment where an agent
of the IRS used a concealed device to tape-record a
conversation with the defendant in the defendant's
office. The Court stressed that the defendant took
the risk that his offer of a bribe would be testified
to in court. This rationale was developed further
in *Hoffa v United States,* 385 US 293, 302; 87 S Ct
408; 17 L Ed 2d 374 (1966), where the Court said
that it had never expressed the view "that the
Fourth Amendment protects a wrongdoer's mis-
placed belief that a person to whom he voluntarily
confides his wrongdoing will not reveal it." This
"wrongdoer's belief rationale" was embraced by
this Court in *People v Catania,* 427 Mich 447, 465;
398 NW2d 343 (1986). Justice Harlan's dissent in
*United States v White* contains the best response
to this argument:

> By casting its "risk analysis" solely in terms of
> the expectations and risks that "wrongdoers" or
> "one contemplating illegal activities" ought to
> bear, the plurality opinion . . . misses the mark
> entirely. [This decision] does not simply mandate
> that criminals must daily run the risk of unknown
> eavesdroppers prying into their private affairs; it
> subjects each and every law-abiding member of
> society to that risk. The very purpose of interpos-
> ing the Fourth Amendment warrant requirement
> is to redistribute the privacy risks throughout

society . . . . [401 US 745, 789; 91 S Ct 1122; 28 L Ed 2d 453 (1971).][2]

Similarly, this Court in *Beavers* stated,

> The warrant requirement is not a burdensome formality designed to protect those who would engage in illegal activity, but, rather, a procedure which guarantees a measure of privacy and personal security to *all* citizens. The interests of both society and the individual should not rest upon the exercise of the unerring judgment and self-restraint of law enforcement officials. Our laws must ensure that the ordinary, law-abiding citizen may continue to engage in private discourse, free to speak with the uninhibited spontaneity that is characteristic of our democratic society. [*Id.* at 566.]

In *Katz v United States,* 389 US 347; 88 S Ct 507; 19 L Ed 2d 576 (1967), the Court appeared to abandon the trespass rationale and declared that Fourth Amendment interests are implicated when the government infringes upon an individual's legitimate expectations of privacy. In *Katz,* federal agents attached a listening device on the outside of a public telephone booth and overheard the defendant's conversation without knowledge or consent of either party to the telephone conversation. Our Court adopted this "reasonable expectation of privacy" test in *People v Smith,* 420 Mich 1, 21; 360 NW2d 841 (1984).[3] After *Katz,* it was unclear

[2] Today's majority opinion again incorporates the wrongdoers' risk analysis rationale. *Ante,* p 40.

[3] Interestingly, if we applied this reasonable expectation of privacy test per se to the phone conversation of the defendant in the case at bar, the defendant should prevail. One of the monitored telephone calls was placed to the defendant in his home. Being in one's own home should give rise to legitimate expectations of privacy which society is willing to recognize as reasonable.

But, unfortunately, this Court, in *Catania,* employed the wrong-

whether the cases which had relied on the absence of physical trespass had been overruled. But, for purposes of the monitoring of conversations where one party to the conversation gave consent, the Court, in *United States v White, supra* at 749, applied the "assumed risk" analysis and concluded that such monitoring did not require a warrant because the defendant had no "justifiable and constitutionally protected expectation that a person with whom he is conversing will not then or later reveal the conversation to the police."

Through dissenting opinions, four justices in *White* expressed the view that, even when one of the parties to the conversation consents to the monitoring, the Fourth Amendment prohibits third-party electronic monitoring without a warrant. In *Beavers,* this Court adopted this dissenting view and declared that our state constitution requires a warrant for third-party electronic monitoring.

### III

### A

The first point made by the majority is that eavesdropping was not a concern of the original drafters of the Fourth Amendment. The "original intent" doctrine of constitutional interpretation has been soundly criticized by legal scholars.[4] In addition, this argument has surfaced before and Justice Douglas, in his dissent in *White,* appropriately responded that the *change in technology*

doer's assumption of risk analysis in determining whether there is a "reasonable expectation of privacy." Therefore, under *Catania,* the defendant's misplaced belief that the informant would not reveal his speech destroys any reasonable expectation of privacy.

[4] See Chemerinsky, *Foreword: The vanishing constitution,* 103 Harv L R 43, 91, n 209 (1989) (citing Levy, Original Intent and the Framers' Constitution).

since the drafting of the constitution makes this
analogy as convincing as "treat[ing] man's first
gunpowder on the same level as the nuclear
bomb." 401 US 756. Surely the common-law nui-
sance of eavesdropping was not equivalent to the
pervasive forms of intrusion possible today. Even
though our forefathers could not have foreseen the
myriad of listening devices available today, they
did foresee the dangers of invading the privacy of
the citizenry. The advance of technology makes it
imperative that we be more diligent, not less, in
the protection of the right of people to be secure
"in their persons, houses, papers and effects"
against unreasonable searches and seizures. Now
that it is a simple matter to intrude into people's
houses without physically entering the walls,
eavesdropping is no longer the innocuous form of
nuisance that failed to concern the drafters of the
Fourth Amendment. The majority declares that
the Fourth Amendment was aimed at the general
warrants of the British officers who carried on
"unlimited searches of private homes." *Ante,* p 14.
Through the use of high-powered microphones,
minuscule bugging devices and undetectable tele-
phone taps, the police officer of today, like the
British officer of old, can literally carry on "unlim-
ited searches of private homes." Indeed, the very
concept of a "private home" is in danger.

In discussing *Beavers,* the majority states that
the Court

> rationalized its decision by focusing exclusively on
> federal case law. Its analysis cited no Michigan
> authority, it made no reference to the history of
> the adoption of art 1, § 11 of the Michigan Consti-
> tution, and it placed no reliance on textual differ-
> ences between the state and federal constitutions.
> Nevertheless, the Court stated that "[w]hile the
> result reached today reflects an analysis of Federal

case authority, our conclusion is based upon the Michigan Constitution . . . ." [*Ante,* p 22.]

The majority disparages *Beavers* because the opinion in that case focused on federal case law. But it is logical to examine the rationale of the Supreme Court since the search and seizure provision of our state constitution is closely parallel to the Fourth Amendment. It does not follow, however, that this Court is bound by federal precedent it finds unpersuasive. The Court in *Beavers* examined the reasoning in *White* and simply found it unpersuasive:

> [W]e are persuaded by the logic of Justice Harlan [in dissent] which recognizes a significant distinction between assuming the risk that communications directed to one party may subsequently be repeated to others and the simultaneous monitoring of a conversation by the uninvited ear of a third party functioning in coöperation with one of the participants yet unknown to the other. . . . We choose not to extend the constitutional bounds of misplaced confidence to encompass the threat of warrantless third-party monitoring of conversations between an unsuspecting speaker and one who knowingly transmits the communication to another. A party speaking in private conversation with another, particularly where the conversation occurs in the speaking party's residence, has not "knowingly expose[d] [this conversation] to the public" . . . . [*Beavers* at 565-566.]

*Beavers* also recognized that surveillance is a vital component of law enforcement, but felt that privacy concerns justified the minimal inconvenience of getting a warrant to perform this surveillance. In short, *Beavers* addressed all of the arguments put forth today, and there are no new arguments to justify the retreat from *Beavers*. The

majority spends most of its energy demonstrating that the Fourth Amendment does not require a warrant in this situation. But to reiterate, this misses the point. Under *White,* the Fourth Amendment did not require a warrant in 1975 either, but the Michigan Constitution, as interpreted by this Court in *Beavers, did* require a warrant. A change in personnel, either on the United States Supreme Court or on this Court should not result in a fundamental shift in Michigan constitutional law. When the *Beavers* Court rejected the reasoning of the plurality in *White,* it demonstrated the independence of this Court and renounced rote conformity to the reasoning of the justices on the United States Supreme Court.

### B

The majority quotes Justice Brickley from *People v Nash,* 418 Mich 196, 213; 341 NW2d 439 (1983):

> "There is no indication that in readopting the language [of art 1, § 11] the people of this state wished to place restrictions on law enforcement activities greater than those required by the federal constitution. In fact, the contrary intent is expressed." [*Ante,* p 28.][5]

And yet, when *Beavers* was decided, this Court did not feel constrained by this "contrary intent." The Court in *Beavers,* chose not to follow the prevailing interpretation of the United States Supreme Court. This history of the provision does not support a withdrawal from *Beavers.* The majority again cites *Nash* for a disapproval of expanding

---

[5] I reiterate my view, as expressed in *Nash,* that the state standard for a constitutional violation has no relation to the rule imposed to deter violations of the standard.

rights under this provision: "The history of Const 1963, art 1, § 11 . . . suggest[s] that its further expansion, with the concomitant expansion of the exclusionary rule to enforce it, should occur only when there is a compelling reason to do so." 418 Mich 214. Preserving the *Beavers* warrant requirement is not an expansion, but rather the preservation of the status quo. It is the majority position which performs the expansion, expanding the rights of the police force to invade the privacy of the people without warrant or probable cause. I would argue that this Court should require a "compelling reason" to justify this departure from our prior holding.

The majority fails to offer any such compelling reason. The majority declares that although we rejected the plurality view in *White* at the time of the *Beavers* case, this Court later adopted the *Hoffa* principle upon which that reasoning rested. But the *Hoffa* principle of assuming the risk that associates may be government informants does not resolve this issue. I disagree with the majority that "there is no significant constitutional distinction between participant monitoring and participant recording." *Ante,* p 24, n 25. In *Beavers,* the Court recognized a distinction and declared that in the use of the phrase "participant monitoring" the Court meant to "specifically refer to the use of an electronic device by a participant of a conversation which *transmits the exchange to a third party.* We do not address those situations which include a participant himself recording the conversation . . . ." *Id.* at 562, n 2. (Emphasis added.) The Court recognized that it is more intrusive when a third party, unknown to one party to the conversation, listens in on a conversation—a conversation whose content is unknown, even to

the consenting party, at the time consent is given.[6] The "assumption of the risk" argument ignores the opposite expectation that the person with whom he is conversing may *not* reveal it later; this possibility is completely obliterated by third-party monitoring whose simultaneous nature removes any time for reflection on the part of the consenting party. Removing this possibility tips the scales in favor of the police. This distinction between third-party monitoring and participant monitoring provided much of the justification for the *Beavers* decision. Without a warrant requirement there is no limit to the police officer's discretion, and free and open discourse is no longer a reasonable risk; instead, the risk becomes an inordinate one in which even the person to whom you are speaking forfeits the option of keeping the discourse private. With third-party monitoring, the option is bargained away in advance before the content of the conversation is even ascertained.

IV

Although not argued by the people, the majority does present one consideration that was only implicitly considered by *Beavers,* but it is not nearly substantial enough to support a departure from stare decisis. The majority declares that "strict adherence to warrant requirements may be impossible in the context of participant monitoring." *Ante,* p 37. As evidence of this "impossibility" the majority offers two arguments. The first argument revolves around MCL 780.655; MSA 28.1259(5), requiring the officer executing the warrant to give the individual from whom the property or things

---

[6] Justice Harlan in his dissent in *White* also expressed the view that the effect on privacy is far greater with third-party eavesdropping and that this effect on privacy results in a warrant requirement. See *White,* 401 US 786-789.

are seized a copy of the warrant "forthwith." The majority then declares that such a requirement cannot be met without alerting the suspect, thereby defeating the purpose of the monitoring. *Ante,* p 37. This argument is specious. The statute does not expressly require the warrant to be given until *after* the items are seized. The statute declares that "[t]he officer taking property or other things under the warrant shall forthwith give to the person from whom or from whose premises the property *was taken* a copy of the warrant . . . ." The statute uses the past tense; *after* the search, and *after* items are seized, the warrant is given "forthwith" to the person who was searched. This requirement would not frustrate the purpose of the monitoring in any way. In addition, the statute allows for "leav[ing] a copy of the warrant and tabulation at the place from which the property or thing *was* taken." MCL 780.655; MSA 28.1259(5). (Emphasis added.) In other words, if no one is present when the search occurs, the copy is clearly given *after* the search takes place. The statute does not expressly require *prior* notification of a search. Advance notice of any search would frustrate the purpose of the search in question.

The second argument discussed by the majority opinion is the requirement of "describing with particularity" the items to be seized. "Of course, future conversations are nonexistent until they take place . . . '[h]ow does one specifically describe the conversation to be seized?' " *Ante,* p 38. Obviously, this "problem" would apply to all forms of wiretaps and surveillance. The topic of the conversation to be seized and the parties to the conversation can be described with sufficient particularity to obtain a warrant. The "problem" is contrived, particularly since a warrant indeed was obtained in this case and neither side argued that

it did not "describe with sufficient particularity."[7] Additionally, if the item to be seized cannot be described with "sufficient particularity" it is probably a mere fishing expedition and *should* be barred by the constitution. See *Berger v New York,* 388 US 41, 63; 87 S Ct 1873; 18 L Ed 2d 1040 (1967) ("It is said that neither a warrant nor a statute authorizing eavesdropping can be drawn so as to meet the Fourth Amendment's requirements. If that be true then the 'fruits' of eavesdropping devices are barred under the Amendment"). The Court in *Berger* also declared that

> it is not asking too much that officers be required to comply with the basic command of the Fourth Amendment before the innermost secrets of one's home or office are invaded. Few threats to liberty exist which are greater than that posed by the use of eavesdropping devices. Some may claim that without the use of such devices crime detection in certain areas may suffer some delays since eavesdropping is quicker, easier, and more certain. However, techniques and practices may well be developed . . . without attending illegality.

Mere expediency in law enforcement should not justify trampling on the rights of the citizenry. See *Mincey v Arizona,* 437 US 385, 393; 98 S Ct 2408; 57 L Ed 2d 290 (1978) ("[T]he mere fact that law enforcement may be made more efficient can never by itself justify disregard of the Fourth Amendment").

V

The final argument of the majority is that participant monitoring often serves " 'to protect the

---

[7] The warrant in this case was challenged as statutorily defective, but the invalidity was related to the credibility of the informant and not to the description of the conversation to be seized.

life of the agent or informant.' " *Ante,* p 39. There
is nothing in the exclusionary rule that prohibits
the use of participant monitoring for *safety* pur-
poses; the exclusionary rule operates merely to
prevent the admission of evidence at trial. The
police would remain free to use participant moni-
toring to protect their officers.

### VI

There have been no changing conditions or evi-
dence of injustice which would justify this retreat
from the established precedent in *Beavers.* As I
have stated before,

> Adherence to sound judicial precedent gives con-
> tinuity and predictability to the law. It assures
> that judicial decisions will be the result of reason
> rather than the whim of the judge before whom a
> case is tried. Only compelling reasons justify a
> court in disregarding longstanding precedent. [*Peo-
> ple v Cipriano,* 431 Mich 315, 352; 429 NW2d 781
> (1988) (CAVANAGH, J., dissenting).]

I continue to hold this view and the majority has
not put forth any compelling reasons to justify this
Court in disregarding this longstanding precedent.

I dissent.

LEVIN, J., concurred with CAVANAGH, C.J.

MALLETT, J., took no part in the decision of this
case.