CAVANAGH, J.
(dissenting). “[T]he task of combating crime and convicting the guilty will in every era seem of such critical and pressing concern that we may be lured by the temptations of expediency into forsaking our commitment to protecting individual liberty and privacy.” United States v Leon, 468 US 897, 929-930; 104 S Ct 3405; 82 L Ed 2d 677 (1984) (Brennan, J., dissenting). Today, the majority has chosen to ignore Michigan’s history of protecting our citizens against unreasonable searches. As a result, in choosing to adopt the good-faith exception to the exclusionary rule, the majority has forsaken its commitment to our citizens and failed to resist the lure of expediency. Therefore, I must respectfully dissent.
The majority claims that there is no compelling reason for Michigan to provide greater protection against unreasonable searches than that provided by the federal constitution.[1] I disagree with the majority that Michigan must have a compelling reason to provide *559 greater protection to our citizens than that provided by the federal constitution. Instead, I believe this Court should be required to show a compelling reason to depart from past precedent. See People v Collins, 438 Mich 8, 50; 475 NW2d 684 (1991) (CAVANAGH, C.J., dissenting). However, even if this Court must demonstrate a compelling reason to offer greater protection to our citizens, Michigan’s jurisprudential history certainly meets this test.
Over forty years before the United States Supreme Court extended the exclusionary rule to the states in Mapp v Ohio, 367 US 643; 81 S Ct 1684; 6 L Ed 2d 1081 (1961), Michigan adopted the exclusionary rule in People v Marxhausen, 204 Mich 559, 573-574; 171 NW 557 (1919). “[T]his Court created a body of state constitutional search and seizure law and adopted an exclusionary rule, all before either was subject to a federal floor.” People v Nash, 418 Mich 196, 214; 341 NW2d 439 (1983) (opinion of BRICKLEY, J.). In Marx-hausen, supra at 563, this Court wisely stated that it is “the essence of a free government that the individual shall be secure in his person, his home and his property from unlawful invasion, from unlawful search, from unlawful seizure.”
This Court further articulated the importance of the exclusionary rule in People v Halveksz, 215 Mich 136, 138; 183 NW 752 (1921).
Under a government of laws the security afforded persons, houses and possessions against search without a warrant, lawfully obtained, must not be violated by officers of the law. The law must point the way to legitimate search and seizure and will tolerate none other. Officers of the law must act within the law and if they invade the security guaranteed individuals by the Constitution, such invasion cannot bring to the aid of justice the fruit of their violation. It is the duty of courts, when attention is seasonably called *560 to a violation of a constitutional right, in obtaining evidence in criminal prosecutions, to vindicate the protection afforded individuals by the Constitution, and to suppress such evidence. [Id.]
The compelling reason test “should not be understood as establishing a conclusive presumption artificially linking state constitutional interpretation to federal law.” Sitz v Dep’t of State Police, 443 Mich 744, 758; 506 NW2d 209 (1993). The majority’s application of the compelling reason test disregards this, however, and ignores the jurisprudential history of the exclusionary rule in this Court. Those who have come before us have dedicated themselves to upholding Michigan’s Constitution and providing reasoned analysis. Not only did this Court adopt the exclusionary rule before being required to do so, it also declined to recognize a good-faith exception to the exclusionary rule in People v Bloyd, 416 Mich 538, 556; 331 NW2d 447 (1982). Our state is not obligated to discard decades of sound analysis and reasoned jurisprudence merely because the United State Supreme Court has announced a decision limiting citizens’ federal constitutional rights contrary to Michigan jurisprudence.[2] This Court is “not *561 obligated to accept what we deem to be a major contraction of citizen protections under our constitution simply because the United States Supreme Court has chosen to do so.” Sitz, supra at 763. Our state is free to provide more protections to its citizens than the United States Constitution does. This Court’s adoption of the exclusionary rule decades before being required to do so, and its subsequent decision not to adopt a good-faith exception, is more than sufficient to qualify as a compelling reason.
Notably, those who framed and adopted the Constitution were concerned about expanding the protection under Michigan’s search and seizure provision beyond that of the federal constitution as it was interpreted in 1963. Collins, supra at 27; see also Nash, supra at 214. In 1963, the United States Supreme Court had adopted the exclusionary rule, but had not yet adopted the good-faith exception. Therefore, the 1963 ratification of our Constitution cannot support the notion that our citizens sought to have Michigan’s Constitution adopt the good-faith exception as contained in the federal constitution, when it would be over twenty years before this exception was indeed recognized under the federal constitution. “[W]e may not disregard the guarantees that our constitution confers on Michigan citizens *562 merely because the United States Supreme Court has withdrawn.. . such protection.” Sitz, supra at 759. Unless the ratifiers were prescient, they could not know how the United State Supreme Court might interpret the federal constitution in future years. Therefore, it is illogical to claim that the 1963 ratification essentially foreclosed an interpretation of our Constitution that differs from that of the federal constitution.
Remarkably, the majority claims that the only purpose of the exclusionary rule is to deter police misconduct. That claim is incomplete and ignores the other well-documented purpose of the exclusionary rule. The United States Supreme Court has stated that the purposes of the exclusionary rule are to protect a person’s Fourth Amendment guarantees by deterring lawless conduct by police officers and to close the courthouse doors “to any use of evidence unconstitutionally obtained.” Wong Sun v United States, 371 US 471, 486; 83 S Ct 407; 9 L Ed 2d 441 (1963); see also Brown v Illinois, 422 US 590, 599; 95 S Ct 2254; 45 L Ed 2d 416 (1975); Terry v Ohio, 392 US 1, 12-13; 88 S Ct 1868; 20 L Ed 2d 889 (1968) (The exclusionary rule serves to deter police misconduct and preserve judicial integrity.); Elkins v United States, 364 US 206, 222; 80 S Ct 1437; 4 L Ed 2d 1669 (I960).[3]
*563 “Courts which sit under our Constitution cannot and will not be made party to lawless invasions of the constitutional rights of citizens by permitting unhindered governmental use of the fruits of such invasions.” Terry, supra at 13. The exclusionary rule “is directed at all unlawful searches and seizures, and not merely those that happen to produce incriminating material or testimony as fruits.” Brown, supra at 601 (emphasis added). In Mapp, supra at 648, the United States Supreme Court quoted Weeks v United States, 232 US 383, 393; 34 S Ct 341; 58 L Ed 652 (1914), as follows:
“If letters and private documents can thus be seized and held and used in evidence against a citizen accused of an offense, the protection of the Fourth Amendment declaring his right to be secure against such searches and seizures is of no value, and, so far as those thus placed are concerned, might as well be stricken from the Constitution. The efforts of the courts and their officials to bring the guilty to punishment, praiseworthy as they are, are not to be aided by the sacrifice of those great principles established by years of endeavor and suffering which have resulted in their embodiment in the fundamental law of the land.”
As Justice Scalia also recently wrote in Crawford v Washington, 541 US_,_; 124 S Ct 1354, 1373; 158 L Ed 2d 177 (2004), the framers of the United States *564 Constitution “knew that judges, like other government officers, could not always be trusted to safeguard the rights of the people . . . .”[4]
Without the exclusionary rule, the assurance against unreasonable searches and seizures would be “valueless and undeserving of mention in a perpetual charter of inestimable human liberties . . .Mapp, supra at 655. The Constitution exists to protect us all. Hundreds of years ago, our founders had the wisdom to recognize that our government must be held to the highest standards.[5] It must be accountable to the people, for without the people, government has no reason to exist.
In today’s decision, the majority treats our Constitution as an impediment that courts must maneuver around for the justice system to work. This is evident in its zeal to adopt the good-faith exception in this case when the search warrant at issue does not come close to meeting the standards articulated in Leon. “Probable cause to issue a search warrant exists where there is a ‘substantial basis’ for inferring a ‘fair probability’ that contraband or evidence of a crime will be found in a particular place.”[6] People v Kazmierczak, 461 Mich 411, 417-418; 605 NW2d 667 (2000). Leon, supra at 914-915, *565 926, held that the good-faith exception does not apply if the magistrate abandoned his detached and neutral role, the police officers were dishonest or reckless, or the police officers could not have had an objectively reasonable belief that probable cause existed.
This is not a case where there was a mere typographical error that was not discovered until after the warrant was carried out. See, e.g., Arizona v Evans, 514 US 1, 15-16; 115 S Ct 1185; 131 L Ed 2d 34 (1995) (a police officer acted on incorrect computer data entered by a court clerk). And this is certainly not a case where there was a close call about the sufficiency of an affidavit. See, e.g., Leon, supra at 904. We concur in the findings of the trial court, which stated:
In order for the warrant to be sustained the observations were made of a recent nature. Examination of the affidavit in support of a warrant, a search warrant, dues [sic, does] nothing to enlighten anyone. It obtains no reference as to when these contacts between Officer Born and the defendant were had, was not able to tell how close in time the contacts were with respect to defendant’s alleged activities posing as a firefighter, how close the time those activities were to the date of the affidavit for the warrant.
Also looking at the affidavit, I don’t find anything in the affidavit connecting the location of the dwelling, 29440 Hazelwood, Inkster, Michigan, to this defendant for any information stating why there is a request to search this location.
It doesn’t have to be the defendant’s residence but there has to be, in this Court’s judgment, something connecting the defendant to the location that was searched.
Whether it was somewhere he worked, whether it was somewhere he was seen going in and out of. Whether it was somewhere he lived, or someone saw him going into after *566 the incident, was it his girlfriend or him being associated in some manner with that location.
And on the face of the affidavit I don’t find anything connecting the defendant to that location that was searched.
So therefore based on those findings by the Court, I’m going to grant the motion. I don’t think that the affidavit sufficiently established the probable cause necessary so that the magistrate could properly have issued the warrant. So the motion is granted.
This is a case in which the affidavit offered absolutely no information linking defendant to the address on the warrant. It was not objectively reasonable for the police officers to have relied on a warrant that did not provide any information connecting defendant with the place to be searched. The majority pointedly states that the information provided was not false or misleading. And I agree, but that is only because it is impossible for one to find nonexistent information false or misleading.[7]
*567 The good-faith exception is premised on the belief that the law enforcement officer was “ ‘acting as a reasonable officer would and should act in similar circumstances.’ ” Leon, supra at 920, quoting Stone v Powell, 428 US 465, 539-540; 96 S Ct 3037; 49 L Ed 2d 1067 (1976) (White, J., dissenting). Leon even states, “We emphasize that the standard of reasonableness we adopt is an objective one.... The objective standard we adopt, moreover, requires officers to have a reasonable knowledge of what the law prohibits.” Id. at 920 n 20.
Unlike the majority, I give our trained law enforcement officers more credit, and I believe law enforcement officers know that when submitting an affidavit in support of the issuance of a search warrant they must include why they believe the area should be searched. Because of the lack of any information linking defendant to the place to be searched, even under the Leon good-faith exception, this warrant is insufficient.[8]
Further, the magistrate in this case did not review the affidavit for issuance of a search warrant with neutral and detached scrutiny. Id. at 913-914. The magistrate authorized a search warrant that provided no information linking the address with defendant. A neutral and detached magistrate would have directed the police officers to provide information linking the address to be searched with defendant. There is simply no fact indicating a connection between the address and defendant. There is no other term for the magistrate’s approval in this case other than to describe it as being a “rubber stamp for the police.” Id. at 914.
The majority also argues “that the high cost of the exclusionary rule exacts too great a toll on our justice *568 system.” Ante at 541 n 9. The exclusionary rule, grounded in our Constitution, has been the rule of law in Michigan for over eighty years. While it may be obvious, I note that our state has managed to exist for decades with the exclusionary rule and our streets have yet to become teeming with criminals released on “technicalities.”
Finally, I am somewhat heartened by the fact that the ever-sensitive concurrence has seen fit to attack my dissent with a lengthy diatribe championing law and order. I also applaud the concurrence’s ability to vigorously criticize the dissent for its “overwrought language” and “hyperbolic rhetoric,” yet still manage to hysterically argue that the dissent’s approach leaves criminal defendants “on the streets to continue to prey upon their communities . . . .” Ante at 548. While I am unclear how an allegedly increased crime rate is relevant in determining our citizens’ constitutional rights, it is quite a marvel to watch the concurrence criticize the dissent for attempting to protect our citizens’ constitutional liberties.[9] At its core, the concurrence *569 clearly indicates the fundamental difference between my view of our citizens’ constitutional liberties and the majority and concurrence’s views. I believe that the Constitution exists to protect all citizens, and the Bill of Rights, the first ten amendments, to protect all citizens from unlawful acts by the government. I do not believe that requiring the government to follow the law, while attempting to catch those who are allegedly breaking it, is a radical notion so easily dismissed. If, as the concurrence advocates, “[e]vidence is the lifeblood of the criminal justice process,” ante at 546, then I believe that the Constitution is the lifeblood of our democracy, and I do not agree with attempts to violate it.
The concurrence argues that the exclusionary rule has no effect in deterring even a single improper search. It is disingenuous to argue that the actions of law enforcement officers will not be influenced by the knowledge that even “mistakes” that violate a citizen’s constitutional rights are still admissible in a court of law. The facts of this case indicate that the majority and concurrence are willing to classify almost any conduct as a “mistake.” The concurrence even goes so far as to rename these constitutional violations “good-faith imperfections.” Ante at 557 n 12.[10] It is hard to take the arguments of the majority and concurrence seriously when they argue, as they do in this case, that a reasonable law enforcement officer would make the “mistake” of submitting an affidavit in support of a *570 search warrant that provides no link between the defendant and the place to be searched.
The majority and concurrence also argue that excluding evidence seized in violation of our Constitution hinders public confidence. I have much more faith in the people of our state. I believe that public confidence is shattered by a government that does not respect the constitutional rights of its citizens. I believe the citizens of our state understand that the Constitution protects us all and that they do not have to make a choice between constitutional liberties and justice. I believe our citizens expect the government to follow the law, just as they are required to do. No matter how “indispensable” evidence may be, law enforcement officers are not given a free pass merely because they are cloaked with governmental authority. The concurrence indicates its belief that our citizens’ constitutional liberties should be discarded because it will make us “safer.” What a peculiar notion. Contrary to the concurrence, I agree with the following values, stated so eloquently by Justice Brandéis in his dissenting opinion in Olmstead v United States, 277 US 438, 485; 48 S Ct 564; 72 L Ed 944 (1928):
Decency, security and liberty alike demand that government officials shall be subjected to the same rules of conduct that are commands to the citizen. In a government of laws, existence of the government will be imperilled if it fails to observe the law scrupulously. Our Government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. Crime is contagious. If the Government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy. To declare that in the administration of the criminal law the end justifies the means—to declare that the Government may commit crimes in order to secure the conviction of a private criminal—would bring *571 terrible retribution. Against that pernicious doctrine this Court should resolutely set its face.
In the future, I am confident that history will show that the tactics used by the concurrence are flawed ones. Our citizens’ concerns about safety should not be exploited because the concurrence believes that it has some divine notion about the Constitution’s meaning. If the Constitution truly means what the concurrence argues, then crime rates and public confidence have nothing to do with the analysis. The concurrence claims that the “the dissent’s constitution is one that would be unrecognizable to the framers of the United States Constitution or the Michigan Constitution, as well as to generations of justices . . . .” Ante at 557.1 believe what would be unrecognizable to the framers and past generations of justices would be the majority and concurrence’s insistence on discarding the rights of our citizens for their new version of a law and order society that these justices have decided is best for the people. Our decisions are our legacy. History will be our judge, and I welcome its review.
When our government violates our citizens’ constitutional rights, it should find no refuge in our courts. Today, the majority disregards decades of reasoned and sound jurisprudence by this Court protecting our citizens against unreasonable searches. Therefore, I respectfully dissent.
Kelly, J., concurred with Cavanagh, J.

 “The right of the people to he secure in their persons, houses, papers, and effects, against unreasonable searches and seizures shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.” US Const, Am IV
“The person, houses, papers and possessions of every person shall be secure from unreasonable searches and seizures. No warrant to search any place or to seize any person or things shall issue without describing them, nor without probable cause, supported by oath or affirmation. The provisions of this section shall not be construed to bar from evidence in any criminal proceeding any narcotic drug, firearm, bomb, explosive or any other dangerous weapon, seized by a peace officer outside the curtilage of any dwelling house in this state.” Const 1963, art 1, § 11.

 Other jurisdictions have also rejected the good-faith exception on state constitutional or statutory grounds. See, e.g., State v Lacasella, 313 Mont 185, 194; 60 P3d 975 (2002); Dorsey v State, 761 A2d 807, 817, 820 (Del, 2000) (“Without a constitutional remedy, a Delaware ‘constitutional right’ is an oxymoron that could unravel the entire fabric of protections in Delaware’s two hundred and twenty-five year old Declaration of Rights.”); Harvey v State, 266 Ga 671, 672; 469 SE2d 176 (1996); State v Canelo, 139 NH 376,382-383; 653 A2d 1097 (1995); State v Gutierrez, 116 NM 431, 446-447; 863 P2d 1052 (1993) (“Denying the government the fruits of unconstitutional conduct at trial best effectuates the constitutional proscription of unreasonable searches and seizures by preserving the rights of the accused to the same extent as if the government’s officers had stayed within the law.”); State v Guzman, 122 Idaho 981, 989, 998; 842 P2d 660 (1992); Commonwealth v Edmunds, 526 Pa 374, 397-398, 402; 586 A2d 887 (1991); State v Oakes, 157 Vt 171, 173; 598 *561 A2d 119 (1991); State v Marsala, 216 Conn 150, 151; 579 A2d 58 (1990); State v Carter, 322 NC 709, 710, 719-720; 370 SE2d 553 (1988) (The exclusionary rule is necessary “for the sake of maintaining the integrity of the judicial branch of government.”); State v Novembrino, 105 NJ 95, 153, 156-159; 519 A2d 820 (1987) (“By eliminating any cost for noncompliance with the constitutional requirement of probable cause, the good-faith exception assures us that the constitutional standard will be diluted.”); State v McKnight, 291 SC 110, 114; 352 SE2d 471 (1987); Commonwealth v Upton, 394 Mass 363, 365-366; 476 NE2d 548 (1985); People v Bigelow, 66 NY2d 417, 422-423; 488 NE2d 451 (1985).

 While the United States Supreme Court, after its Leon decision, has primarily focused on the deterrence of police misconduct in justifying the good-faith exception, it has not failed to recognize that other purposes still exist. In Illinois v Krull, 480 US 340, 347; 107 S Ct 1160; 94 L Ed 2d 364 (1987), the Court refers to police deterrence as the “ ‘prime purpose’ of the exclusionary rule,” but it does not state that it is the sole purpose. (Citation omitted.) While discussing the deterrent effects of the exclusionary rule in James v Illinois, 493 US 307, 314; 110 S Ct 648; 107 L Ed 2d 676 (1990), the Court refers to the purposes of the exclusionary rule. See also Colorado v Connelly, 479 US 157, 169; 107 S Ct 515; 93 L Ed 2d 473 (1986) (the exclusionary rule is aimed at deterring lawless conduct by the police and the prosecutor).
*563 Even if one were to assume that the United States Supreme Court has abandoned the concerns it expressed in Mapp, supra at 659, about ensuring and maintaining judicial integrity, I cannot agree that those concerns should be abandoned. As stated in Mapp, supra at 659, “Nothing can destroy a government more quickly than its failure to observe its own laws, or worse, its disregard of the charter of its own existence.” And as Justice Stevens stated in his dissent in Arizona v Evans, 514 US 1, 18; 115 S Ct 1185; 131 L Ed 2d 34 (1995), “The [Fourth] Amendment is a constraint on the power of the sovereign, not merely on some of its agents.”

 While Crawford dealt with the Confrontation Clause, Justice Scalia’s words are most fitting in this case as well.

 In 1761, James Otis argued against the general writs of assistance that allowed the British government to search homes at any time of the day or night. Otis argued that only special warrants, in which the complainant swore that he suspected goods were located in a specific place, were valid. The concern with writs of assistance is that “[a] man is accountable to no person for his doings.” James Otis, oral argument, Superior Court of Massachusetts, February 24, 1761, <http://douglasarchives.org/otis_a34.htm> (accessed February 27, 2004). Unfortunately, almost 250 years later, this same issue, albeit it in a slightly different form, plagues us yet again.

 The majority, of course, to even get to Leon, concedes the finding of lack of probable cause.

 Remarkably, the majority refers to violating our Constitution’s probable cause requirement, and therefore our citizens’ constitutional rights, as a “technical defect.” Ante at 540 n 9. I disagree. In this case, conducting a search based on a warrant that does not establish any connection between the place to be searched and a defendant is not merely a technical violation. As the United States Supreme Court recently held, when a warrant does not describe the items to be seized at all, the warrant was so obviously deficient that the search is regarded as warrantless. Groh v Ramirez, 540 US 551,_124 S Ct 1284, 1290; 157 L Ed 2d 1068 (2004). It was unreasonable for a law enforcement officer to rely on a warrant “so patently defective.” Id. at 1292. “[E]ven a cursory reading of the warrant in this case—perhaps just a simple glance—would have revealed a glaring deficiency that any reasonable police officer would have known was constitutionally fatal.” Id. at 1294. Likewise, an affidavit that provides no information linking a defendant to the address to be searched, like the affidavit in this case, is also a glaring deficiency that would be evident to any reasonable law enforcement officer. While Groh dealt with qualified immunity, the Court used the same standard of objective reasonableness articulated in Leon.

 See, e.g., Figert v State, 686 NE2d 827, 832 (Ind, 1997) (the good-faith exception does not apply when the affidavit does not sufficiently link the home to he searched to criminal activity).

 Notably, crime rates have actually been going down. See, e.g., <http://www.ojp.usdoj.gov> and <http://www.fbi.gov> (accessed February 27, 2004). If crime rates are to be considered in constitutional interpretation, as the concurrence indicates, then the falling rates should give the concurrence pause. Perhaps the concurrence will change its notion if the rates continue to fall. Or, if the rates unfortunately increase, the concurrence may argue for a greater contraction of constitutional liberties. Either way, the concurrence’s idiosyncratic method of constitutional interpretation is certainly unique.
The concurrence’s distinctive ideas about constitutional interpretation also extend to its recitation of numerous federal cases dealing with the exclusionary rule in various settings, such as deportation proceedings. In citing the “balancing test” from United States v Janis, 428 US 433, 454; 96 S Ct 3021; 49 L Ed 2d 1046 (1976), the concurrence apparently believes that the more law enforcement officers disregard the exclusionary rule, the less effective it is. Therefore, the lack of a deterrent *569 effect justifies the violation of citizens’ constitutional rights. This very notion—that the government’s disregard of constitutional rights justifies the government’s continued and increased disregard of constitutional rights—appears contrary to logic and, of course, our nation’s history.

 The concurrence also argues that people whose constitutional rights have been violated could pursue a civil damages lawsuit. However, governmental immunity will preclude the vast majority of these lawsuits and, therefore, it is not a realistic remedy. See, e.g., MCL 691.1401 et seq.