*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

UNPUBLISHED
August 27, 2020

v

JOSEPH JOHN UTURO,

Defendant-Appellant.

No. 347311
Montcalm Circuit Court
LC No. 2017-023520-FC

Before: SHAPIRO, P.J., and SERVITTO and LETICA, JJ.

PER CURIAM.

Defendant, Joseph John Uturo, appeals as of right his jury trial convictions of first-degree criminal sexual conduct (CSC-I), MCL 750.520b(1)(b)(*ii*) (sexual penetration by defendant related to victim); and second-degree criminal sexual conduct (CSC-II), MCL 750.520c(2)(b) (sexual contact with victim less than 13 years old and defendant 17 years old or older).[1] The trial court sentenced defendant to 17 to 50 years' imprisonment for the CSC-I conviction and 10 to 15 years' imprisonment for CSC-II conviction.

From 2012 through 2017, the victim in this matter, defendant's biological daughter, lived with defendant. In October 2013, when the victim was nine years old, she came home after school one day to the house where she and defendant resided with family friends. On that day, defendant took the victim into the basement, where his bedroom was located, and sat on his bed next to the victim. He then touched her legs, chest, and vagina over her clothes. Defendant pinned the victim

---

[1] Defendant was charged, in a second amended felony information, with one count of CSC-I, (sexual penetration by defendant related to victim), one count of CSC-I (penetration of victim under 13 by defendant 17 or older), and one count of CSC-II (sexual contact with victim under 13 by defendant 17 or older). Defendant was found guilty of one count of CSC-I (sexual penetration by defendant related to victim), and one count of CSC-II.

down and removed her shirt. He attempted to remove her pants, but the victim kicked him and ran upstairs.

The victim testified at trial that defendant thereafter sexually assaulted her many times by putting his penis in her vagina when she and defendant moved to another home, once when they stayed at a third home, and then again when they were living with defendant's parents, the victim's grandparents. With respect to the last incident, the victim testified that defendant slept in a camper outside his parent's trailer while the victim slept in the trailer with her grandparents, but that on nights that defendant worked, the victim slept in the camper instead. According to the victim, on one night that she was sleeping in the camper in the summer of 2017, defendant came home and penetrated the victim's vagina with his penis. Approximately two weeks later, the victim moved in with her mother. In early August 2017, when the victim's mother told her that she (the victim) was going to go back to live with defendant, the victim told her mother that defendant had abused her. Her mother called the police. Defendant was eventually convicted of one count of CSC-I and one count of CSC-II, as previously stated.

## I. MOTION TO SUPPRESS

On appeal, defendant first argues that the trial court improperly denied his motion to suppress a recorded phone call between him and the victim because the phone call recording was obtained in violation of his Fourth Amendment rights.[2] We disagree.

This Court reviews de novo a trial court's ultimate ruling on a motion to suppress. *People v Steele*, 292 Mich App 308, 313; 806 NW2d 753 (2011). While this Court also reviews de novo questions of law relevant to a motion to suppress, *People v Booker*, 314 Mich App 416, 419; 886 NW2d 759 (2016), we review for clear error a trial court's findings of fact on such motions. *People v Hrlic*, 277 Mich App 260, 262-263; 744 NW2d 221 (2007). We review unpreserved claims of constitutional error, such as the one here, for plain error affecting substantial rights. *People v Carines*, 460 Mich 750, 764; 597 NW2d 130 (1999).[3] Finally, this Court reviews for an abuse of discretion the trial court's decision whether to admit evidence. *People v Lukity*, 460 Mich 484, 488; 596 NW2d 607 (1999). A trial court "abuses its discretion when it chooses an outcome that is outside the range of reasonable and principled outcomes." *People v Waclawski*, 286 Mich App 634, 670; 780 NW2d 321 (2009).

During the investigation into the allegations of sexual abuse, Michigan State Police Trooper Ryan Fras determined that the victim should call defendant to attempt to discuss the abuse with him while he recorded the conversation. The victim and her mother thereafter came to the police station and, with the victim's mother and Trooper Fras present, the victim used her mother's cell phone to call defendant. Trooper Fras had set up recording equipment to ensure that the

---

[2] In the same motion, defendant sought to suppress statements he had made during an in-person interview with police. The trial court's ruling on that issue is not challenged in this Court.

[3] While defendant did file a motion in the trial court to suppress the statements he made in the recorded phone call, the basis for that motion was different from that now presented on appeal.

conversation would be recorded, but did not, according to both he and the victim, tell the victim what to say.

During the phone call, the victim told defendant that they had a problem. Although not true, she told him that she had missed her period for two months, and that he was the last person with whom she "did it." Defendant first stated, "Excuse me? I don't know why you would even say that." However, after the victim assured defendant that she was alone in a bathroom, defendant then began expressing his desire to pick up the victim from her mother's home to discuss what to do. Defendant suggested her missed period could be a result of "change." However, the victim told him that she had no change, and she implied that she was "pretty sure" that the baby was his. Defendant asked the victim not to make those statements. He then stated that his heart was sinking. He discussed the regret he felt, expressed his desire to apologize to her, and recognized that he had made huge mistakes in his life. Defendant again tried to figure out a way to pick up the victim from her mother's home, but the victim ended the phone call and told him that she would call him back. The recording of the phone conversation was played for the jury.

While defendant contends that the admission of the recording violated his Fourth Amendment rights, this contention has been squarely addressed and rejected by our Supreme Court in *People v Collins*, 438 Mich 8; 475 NW2d 684 (1991). In that case, an acquaintance of the defendant approached a state police officer and reported that the defendant had offered him $500 to present false testimony to a local district court judge presiding over a criminal proceeding. *Id.* at 11-12. Based on that information, the state police officer obtained a (later determined invalid) warrant purporting to authorize the participant monitoring and recording of conversations between the defendant and the acquaintance. *Id.* at 12. Thereafter, the acquaintance placed a telephone call to the defendant from the state police office, and the conversation was monitored and recorded by the police with the acquaintance's consent. *Id.* at 12. Our Supreme Court explicitly found that the United States Supreme Court, in *United States v Caceres*, 440 US 741; 99 S Ct 1465; 59 L Ed 2d 733 (1979), "made crystal clear that the Fourth Amendment requires no warrant" for a government agent to record a conversation that one of the participants knew was being recorded. *Collins*, 438 Mich at 23-24. Our Supreme Court further declared that "the warrantless participant monitoring in this case violated no reasonable expectation of privacy on the part of defendant, and . . . there is no compelling reason to interpret Const. 1963, art. 1, § 11 as affording greater protection for this defendant than is provided under the Fourth Amendment." *Id.* at 40. The same holds true here, where, just as in *Collins*, *supra*, a government agent recorded a phone conversation in which one of the participants (the victim) knew it was being recorded. Defendant's argument thus fails.

## II. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant next asserts that he was denied the effective assistance of counsel when his trial counsel failed to provide the prosecution, during the discovery process and prior to trial, a medical record demonstrating the victim's prior treatment for a vaginal injury. We disagree.

"Whether a defendant has been denied the effective assistance of counsel is a mixed question of law and fact." *People v Riley*, 468 Mich 135, 139; 659 NW2d 611 (2003). A judge is to first find the facts and then determine whether those facts "constitute a violation of the defendant's constitutional right to effective assistance of counsel." *Id*. Defendant failed to

preserve his current challenge by requesting a new trial or moving for a *Ginther*[4] hearing below, or by filing a motion to remand in this Court. Accordingly, our review is limited to mistakes apparent on the existing record. *People v Heft*, 299 Mich App 69, 80; 829 NW2d 266 (2012); *People v Payne*, 285 Mich App 181, 188; 774 NW2d 714 (2009).

As stated in *People v Trakhtenberg*, 493 Mich 38, 51; 826 NW2d 136 (2012):

Both the Michigan and the United States Constitutions require that a criminal defendant enjoy the assistance of counsel for his or her defense. Const. 1963, art. 1, § 20; U.S. Const., Am. VI. In order to obtain a new trial, a defendant must show that (1) counsel's performance fell below an objective standard of reasonableness and (2) but for counsel's deficient performance, there is a reasonable probability that the outcome would have been different.

"A reasonable probability is a probability sufficient to undermine confidence in the outcome." *People v Carbin*, 463 Mich 590, 600; 623 NW2d 884 (2001), quoting *Strickland v Washington*, 466 US 668, 694; 104 S Ct 2052, 80 L Ed 2d 674 (1984). "Because the defendant bears the burden of demonstrating both deficient performance and prejudice, the defendant necessarily bears the burden of establishing the factual predicate for his claim." *Carbin*, 463 Mich at 600. In establishing a claim of ineffective assistance of counsel, the defendant must overcome a strong presumption that counsel's performance constituted sound trial strategy. *Id.* In reviewing a claim of ineffective assistance of counsel, this court will not evaluate counsel's decisions with the benefit of hindsight. *People v Grant*, 470 Mich 477, 485; 684 NW2d 686 (2004).

During defense counsel's cross-examination of Dr. N. Debra Simms, he attempted to elicit testimony from Dr. Simms concerning an incident in 2005 wherein the victim was purportedly seen at a health facility for a vaginal injury. The prosecutor objected, asserting that she had never been provided with the health facility record relied upon by defense counsel. Defense counsel indicated that he did not know if the record had been provided to the prosecutor by prior defense counsel[5], but that the victim and her mother should have been aware of the record and could have obtained it themselves. The trial court sustained the prosecutor's objection to the introduction of information contained in that record. While, in order to comply with the trial court's discovery order, defense counsel should have ensured that the medical record at issue was provided to the prosecutor, defendant has failed to establish that, absent defense counsel's failure to provide the document, a different result would have been reached at trial. *Trakhtenberg*, 493 Mich at 51.

Dr. Simms testified that she performed a complete physical evaluation on the victim on September 21, 2017, and noted during her examination that the victim had a well-healed deep notch on her hymen at the "five o'clock" position. Dr. Simms testified that the notch was due to some type of trauma to the hymen. Notably, defense counsel attempted to introduce evidence that

---

[4] *People v Ginther*, 390 Mich 436, 443; 212 NW2d 922 (1973).

[5] Initial defense counsel moved to withdraw as defendant's attorney because "despite numerous requests, the Defendant, Joseph John Uturo, has refused to provide [defense counsel] with a complete list of witnesses and exhibits." Defense counsel's motion was granted.

-4-

the victim had been seen at a medical facility in 2005 when "an older half-sibling had inserted a pen into her vagina and created a ring tear at that six o'clock position 1 millimeter in size where the pen had penetrated her vagina." Dr. Simms testified that the hymenal ring is different from the hymen itself and that she observed a healed trauma to the hymen, but that the hymenal ring was normal. Thus, the evidence defense counsel sought to introduce concerned a potential trauma in a different location than that observed by Dr. Simms. And, Dr. Simms testified at trial that she had, in fact, been told that the victim's sister poked her genital area when the victim was six months old and that the victim had to go to the emergency room. However, Dr. Simms testified that the examination was normal. Nothing in the record actually establishes that the victim had any type of hymenal ring injury when she was younger and, had the medical document been produced to the prosecutor and introduced as evidence at trial, there is no indication that it would have negated or undermined the healed trauma Dr. Simms observed on the victim's hymen.

Moreover, defense counsel was able to elicit testimony from Dr. Simms that the notch in the victim's hymen was not necessarily caused by penile penetration and could have been caused by any number of things, including an injury incurred as an infant, if one had occurred. On cross-examination, defense counsel asked Dr. Simms, " . . . had you been informed that the child had received an injury at ten months old, where a pen was inserted into her vagina leaving a 1-millimeter tear . . . would that have been an important aspect to have been aware of, that information?" Dr. Simms responded that if she had been given a history that there had been an examination of the victim when she was an infant and it was abnormal, she would have wanted further information and that it could have impacted her opinion. Dr. Simms also testified that the trauma that caused the notch on the victim's hymen could have been caused by any kind of trauma. She testified that it was not definitive evidence of sexual penetration by a penis and could have been caused by digital penetration.[6] When defense counsel asked Dr. Simms "if there was an injury at a very young age as an infant, could that . . . be the same injury you're seeing in 2017?" Dr. Simms responded that, "[i]f it were documented that there were a tear, then a tear is a tear, yes, sir." Thus, the jury was presented with testimony that called into question whether defendant caused the notch in the victim's hymen by penetrating her with is penis, as alleged. As a result, defendant was not prejudiced by defense counsel's claimed deficient performance.

III.    JURY INSTRUCTION

Defendant next claims that the trial court abused its discretion when it gave the jury an instruction concerning the violation of a sequestration order without first determining whether the violation of the sequestration order actually prejudiced the prosecution. We disagree.

We review claims of instructional error de novo. *Ward v Consol Rail Corp*, 472 Mich 77, 83; 693 NW2d 366 (2005). We review a trial court's determination whether a jury instruction is applicable to the facts of a case for an abuse of discretion. *People v Guajardo*, 300 Mich App 26, 34; 832 NW2d 409 (2013). The defendant bears the burden of establishing that any asserted instructional error resulted in a miscarriage of justice. *Id*., quoting *People v Dupree*, 486 Mich 693, 702; 788 NW2d 399 (2010). We review a trial court's decision regarding the remedy for the

---

[6] The victim testified that she had been digitally penetrated by a boyfriend.

-5-

violation of a sequestration order for an abuse of discretion. *People v Roberts*, 292 Mich App 492, 502–503; 808 NW2d 290 (2011).

MRE 615 provides, in relevant part, that "[a]t the request of a party the court may order witnesses excluded so that they cannot hear the testimony of other witnesses, and it may make the order of its own motion." The purposes of sequestering witness are to prevent witnesses from "coloring" their testimony to conform with the testimony of another witness, and to assist in detecting testimony that is less than candid. *People v Meconi*, 277 Mich App 651, 654; 746 NW2d 881 (2008) (quotation marks and citations omitted).

In this matter, the trial court instructed before trial that "anybody in the courtroom who may testify during the course of this trial, that you are not to discuss your testimony with anybody for as long as you are sequestered . . . ." However, on the second day of trial, the victim's mother advised the prosecutor that she had gone outside during a break in the proceedings and that defendant was also outside, along with several of defendant's witnesses. According to the victim's mother, two of defendant's witnesses who had already testified, "J1" and "J2" were discussing the testimony that they had just given with, or in front of, two other witnesses who had not yet testified, "C" and "D". "C" was next called to the stand to testify by defense counsel. During cross-examination, the prosecutor asked "C" if she had heard other witnesses discussing the testimony they had just given. When "C" responded that she had, the trial court dismissed the jury from the courtroom and held a hearing in the midst of the trial to question the witnesses who had been involved in and/or heard the prior testimony discussion.

The victim's mother testified that she heard snippets of conversation between previously testifying witnesses concerning dates and times. On the other hand, "J1" and "J2" testified to the trial judge that while others were near them outside, the extent of their discussion was that they had been asked the same questions over and over. Those witnesses both told the judge that they had not discussed specific questions or testimony. "C" told the trial court that the only thing she heard "J1" and "J2" discussing was that they had been asked the same, unspecified questions over and over.

The trial court found that there had been a violation of the sequestration order, and stated that there were two options to resolve the matter: (1) preclude testimony from "D," who had not yet testified, concerning dates; or (2) allow the testimony with acknowledgment to the jurors "with some sort of instruction from the Court that there was a violation of the sequestration order." The trial court further stated that it was going to let the jurors know that it was reported to the court that there had been a violation of the sequestration order, that it found that such violation occurred, and that how the jury let that impact their analysis of the testimony was something the jury would have to decide. Defense counsel stated, "[i]f that's the Court's decision, then I guess we'll deal with that going forward. Yep." The jury was then brought back into the courtroom and the trial court instructed the jury as follows:

> So, members of the jury, while you were having a recess, the Court did conduct some additional inquiry of witnesses. At the beginning of this trial, the Court entered a sequestration order, which means that none of the witnesses were to discuss their testimony with anyone else during the course of this proceeding. I have made a determination that there was a violation of that order, that ["J1" and

-6-

"J2"] had, while outside smoking a cigarette, discussed their testimony, as it relates to—there was some discussion regarding their testimony.

So you need to understand that ["C" and "D" were present], along with some other individuals who were outside, as this conversation was happening. Apparently, there was some smoking of cigarettes and what have you. So I am letting you know that I have made a determination that there was a violation of the sequestration order. How that impacts the testimony, will ultimately be for you, as jurors, to decide.

"C" thereafter continued her testimony and "D" also later testified.

Defendant argues that the trial court's findings regarding the sequestration-order violation were an abuse of discretion because the trial court did not determine whether the violation caused prejudice. We first note that to preserve an instructional error for review, a defendant must object to the instruction before the jury deliberates, *People v Gonzalez*, 256 Mich App 212, 225; 663 NW2d 499, 508 (2003), and it is questionable whether defense counsel did, in fact, object to the instruction now challenged on appeal. Whether the issue was properly preserved, however, is ultimately irrelevant to our review.

Defendant supports his entire argument with only one case, *People v Solak*, 146 Mich App 659; 382 NW2d 495 (1985).[7] This Court held in *Solak*, that "[a] defendant who complains on appeal that a witness violated the lower court's sequestration order must demonstrate that prejudice has resulted." *Id*. at 669. In this case, in contrast, defendant is not arguing that a witness violated the trial court's sequestration order. Defendant argues, instead, that the trial court abused its discretion because it failed to evaluate prejudice before providing the jury with an instruction regarding the sequestration violation. Thus, *Solak* is not applicable to this case.

An appellant may not simply "announce a position or assert an error and then leave it up to this Court to discover and rationalize the basis for his claims, or unravel and elaborate for him his arguments, and then search for authority either to sustain or reject his position." *People v Kevorkian*, 248 Mich App 373, 389; 639 NW2d 291 (2001), quoting *Mitcham v Detroit*, 355 Mich 182; 94 NW2d 388 (1959). Because defendant has provided no authority to support his position, we may properly consider this issue abandoned on appeal. See *id*.

Moreover, even a brief review establishes that the trial court did not abuse its discretion in giving the challenged instruction. All of the witnesses questioned at the hearing conducted during trial testified that they had participated in or heard a discussion between testifying witnesses of, at least tangentially, testimony that those witnesses had given. The trial court could thus conclude that its sequestration order had been violated and that an appropriate jury instruction was applicable to the facts before it. *Guajardo*, 300 Mich App at 34.

---

[7] *Solak* was published before November 1, 1990, so it is not binding on this Court. See MCR 7.215(J)(1). It may, however, still serve as persuasive authority. See *People v Barbarich*, 291 Mich App 468, 476 n 2; 807 NW2d 56 (2011).

## IV. OFFENSE VARIABLE 13

Defendant's final argument on appeal is that the trial court erred in assessing him 50 points for offense variable (OV) 13. We disagree.

We review for clear error a preserved claim regarding a sentencing court's scoring of a sentencing guideline variable. *People v Lockett*, 295 Mich App 165, 182; 814 NW2d 295 (2012). "Clear error exists when the reviewing court is left with a definite and firm conviction that a mistake was made." *People v McDade*, 301 Mich App 343, 356; 836 NW2d 266 (2013). The sentencing court's factual determinations used for sentencing under the sentencing guidelines must be supported by a preponderance of the evidence and are reviewed for clear error. *People v Hardy*, 494 Mich 430, 438; 835 NW2d 340 (2013). "Whether the facts, as found, are adequate to satisfy the scoring conditions prescribed by statute, i.e., the application of the facts to the law, is a question of statutory interpretation, which an appellate court reviews de novo." *Id*. at 438.

Under MCL 777.43(1)(a), a trial court is to score OV 13 at 50 points if "[t]he offense was part of a pattern of felonious criminal activity involving 3 or more sexual penetrations against a person or persons less than 13 years of age." MCL 777.43(2) further provides:

All of the following apply to scoring offense variable 13:

(a) For determining the appropriate points under this variable, all crimes within a 5-year period, including the sentencing offense, shall be counted regardless of whether the offense resulted in a conviction.

\* \* \*

(d) Score 50 points only if the sentencing offense is first degree criminal sexual conduct.

The primary goal of statutory interpretation is to give effect to the Legislature's intent. *TRJ & E Props.*, *LLC v Lansing*, 323 Mich App 664, 670; 919 NW2d 795 (2018). In determining the intent, we begin by construing the language of the statute itself. *People v Maynor*, 470 Mich 289, 295; 683 NW2d 565 (2004). Our focus is on the statute's express language, which offers the most reliable evidence of the Legislature's intent. *Sanford v State*, __ Mich __; __ NW2d __ (2020) (Docket No. 159636). When interpreting an undefined statutory term, the term must be accorded its plain and ordinary meaning, which can be found in a lay dictionary if the words are common and lack a unique legal meaning. *Farris v McKaig*, 324 Mich App 349, 354; 920 NW2d 377 (2018). When, however, a statutory term is a legal term of art, the term must be construed in accordance with its peculiar and appropriate legal meaning. *Id*. Moreover, "statutory interpretation requires courts to consider the *placement* of the critical language in the statutory scheme. We must also give effect to every word, phrase, and clause in a statute and avoid an interpretation that would render any part of the statute surplusage or nugatory." *Johnson v Recca*, 492 Mich 169, 177; 821 NW2d 520 (2012) (internal quotation marks and citation omitted; emphasis in original).

The scored offense in this matter was MCL 750.520b(1)(b)(*ii*), which provides that a person is guilty of first-degree criminal sexual conduct if he or she engages in sexual penetration

with another person who is at least 13 but less than 16 years of age, and the actor is related to the victim by blood or affinity to the fourth degree. Defendant contends that because he was not convicted of sexual penetration against a person less than 13 years of age, the scoring offense was not part of a "pattern" of three or more sexual penetrations against a person less than 13 years of age, and he could thus not be assessed 50 points for OV 13.

We first note that a trial court is to score OV 13 at 50 points if "[t]he offense was part of a pattern of felonious criminal activity involving 3 or more sexual penetrations against a person or persons less than 13 years of age." Had the Legislature intended that the sentencing offense be one of the three penetrations, or that all penetrations must have occurred when the victim was less than 13 years old, it could easily have specified as much. For example, the statute could have been drafted to read that "the offense was one of three or more sexual penetrations against a person or persons less than 13 years of age." Instead, the Legislature chose to employ more expansive language in the statute. In addition, the Legislature elected to use language in MCL 777.43(1)(a) that the 3 or more sexual penetrations are "against a person or persons." This language, when considered with MCL 777.43(2)'s requirement that "all crimes within a 5-year period, including the sentencing offense, shall be counted regardless of whether the offense resulted in a conviction," indicates that the three or more sexual penetrations could be with more than one person. If sexual penetrations against persons other than the victim of the sentencing offense must be included for purposes of assessing point under OV 13, there is no reason to find that sexual penetrations of the same victim are not to be included, whether charged or uncharged. Moreover, MCL 777.43(2)(d) instructs that we are to "[s]core 50 points only if the sentencing offense is first degree criminal sexual conduct." The instruction does *not* require that the sentencing offense be against a person under 13 years old. Again, when interpreting statutes, we review the specific words used in the statute, according every word or phrase of a statute its plain and ordinary meaning, and considering the context in which the words are used. *Lewis v LeGrow*, 258 Mich App 175, 183; 670 NW2d 675 (2003). Thus, the trial court could have counted the sentencing offense as part of a pattern of criminal behavior when there were three or more sexual penetrations against either the victim of the sentencing offense or other victims.

The victim testified at trial that defendant first had sexual contact with her when she lived at a certain residence with him and family friends when she was nine years old. The victim testified that they did not live at the family friends' home for very long and moved around quite a bit. The victim testified that, after they left the home of the family friends, defendant sexually penetrated her a multitude of times. The victim recalled the name of one specific street (the family friends did not live on that street) she and defendant lived on when several of the penetrations occurred, and the name of the city (different from where both the family friends and the other street were located) where another sexual penetration occurred. The victim testified that the last time defendant sexually penetrated her was in the summer of 2017, when she was thirteen years old and she and defendant lived with his parents. The victim did not testify that she and defendant lived at all three of the identified locations only after the fall of 2016, when she had turned 13 years old. Rather, the victim testified that she and defendant lived at the location where the first sexual contact perpetrated by defendant occurred, then moved to two other locations where sexual penetration occurred. Given the victim's testimony that defendant sexually penetrated her at the various residences in which they had lived throughout the years of 2012 (when she was 9 years old) through 2017 (when she was 13 years old), it could reasonably be inferred that defendant sexually penetrated her many times when she was under 13 years old.

Although defendant was convicted of sexual penetration of a person 13-15 years old and to whom he was related, he was charged with an additional count of sexual penetration of a victim under 13. As previously indicated, MCL 777.43(2) requires that when scoring OV 13, "all crimes within a 5-year period, including the sentencing offense, shall be counted regardless of whether the offense resulted in a conviction." There was ample evidence at trial that defendant sexually penetrated the victim continuously and on numerous occasions when she was under 13 years of age, despite that he was not charged with engaging in all of those acts. This is not a situation where defendant regularly (or 3 or more times) engaged in sexual penetration of victims over 13 years of age and, on a single occasion, engaged in sexual penetration of a victim under 13 years of age. Instead, the testimony at trial established that defendant had a continuous pattern of sexually penetrating the same victim when she was under 13 and, on one specific occasion, engaged in sexual penetration of the victim after she had turned 13 years of age. The trial court could rely on the victim's testimony to find that defendant's conviction of CSC-I was part of a pattern of felonious criminal activity involving 3 or more sexual penetrations against a person or persons less than 13 years of age. MCL 777.43(1)(a). It could also find by a preponderance of the evidence that OV 13 should be scored at 50 points. That finding was not clearly erroneous. *Hardy*, 494 Mich at 438.[8]

Affirmed.

/s/ Douglas B. Shapiro
/s/ Deborah A. Servitto
/s/ Anica Letica

---

[8] The trial court sentenced defendant within the sentencing guidelines, such that to the extent that the trial court relied upon the victim's testimony to score OV 13 at 50 points, it was permitted to do so. See, *People v Biddles*, 316 Mich App 148, 158; 896 NW2d 461 (2016).